United States Court of Appeals,

Fifth Circuit.

No. 92-2493.

ESTATE OF Finis A. O'DANIEL, Deceased, Keith A. O'Daniel, and Deborah N. Cantrell, Co-Executors, Plaintiffs-Appellees, Cross-Appellants,

v.

UNITED STATES of America, Defendant-Appellant, Cross-Appellee.

Nov. 9, 1993.

Appeals from the United States District Court for the Southern District of Texas.

Before GARWOOD, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The United States challenges the district court's holding that the proceeds of twelve key man insurance policies[1] are not includable in the estate of Finis A. O'Daniel. The estate and its executors (collectively, the "Estate"),[2] in turn, claim that the district court erred in holding that the estate was not entitled to estate tax deductions for deficiency interest that was later refunded. Finding no reversible error, we affirm.

I.

A.

Pioneer Food Industries, Inc. ("Pioneer"), owned life insurance policies on the life of its chief executive officer, Finis A. O'Daniel. Pioneer paid the premiums on the policies, and the policies named Pioneer as the beneficiary.[3]

Pioneer began negotiations for a merger with the Pillsbury Company that would result in Pillsbury's owning the insurance policies. During the negotiations, there were discussions about

---

[1]A "key man" insurance policy is a life insurance policy owned by a company on the life of an important corporate officer.

[2]The co-executors of the estate are Deborah N. Cantrell and Keith A. O'Daniel, the only children of Finis A. O'Daniel.

[3]O'Daniel's life was also insured by certain group insurance policies, the proceeds of which are not at issue here.

Pillsbury's selling the life insurance policies to O'Daniel. The general counsel for Pioneer, Norvell Plowman, testified that he met with Jerry Levin, an officer of Pillsbury, during a lunch meeting in Minneapolis, at which they agreed that Pillsbury would sell the life insurance policies to O'Daniel at the closing date of the merger.[4] Levin testified by deposition that there was such an agreement, although he did not state whether the agreement was struck at the lunch meeting in Minneapolis, or on a different day.[5] No written agreement regarding the sale of life insurance policies from Pillsbury to O'Daniel was ever executed, either before or after the merger.

On June 29, 1979, Pioneer merged with Pillsbury. On the morning of the merger, O'Daniel and Levin reconfirmed that O'Daniel would own the insurance policies at the time of the closing.[6] One week after the Pillsbury-Pioneer merger, on July 8, 1979, O'Daniel and his wife signed a trust agreement (the "life insurance trust"), which provided that O'Daniel transferred the life insurance policies to his wife as trustee.[7]

---

[4]Plowman testified,

> I said, "and he [O'Daniel] wants to buy the key man life insurance that Pioneer owns on him. He wants to do it at closing at cash value." Jerry said, Fine. [Quotation marks added.]

During the meeting, the men discussed other aspects of O'Daniel's compensation package. After the merger, O'Daniel would earn $55,000 per year in salary and $110,000 per year in "deferred compensation." O'Daniel would assume the position of president of the Pioneer Foods division of Pillsbury.

[5]Levin testified that by the time of the closing of the merger, there was an agreement for Pillsbury to sell the policies to O'Daniel. Levin also testified that when acquiring another company, Pioneer usually sold any key man insurance policies owned by the target company to the key man.

[6]Plowman testified,

> And he [O'Daniel] said, "I'm going to own these key man life insurance policies at the close, you know, and I'm going to pay cash value." [Quotation marks added.]

Charles Joseph Giroir, Jr., outside counsel to Pioneer, testified to the same effect.

[7]The trust provided in part,

> *Principal of the Trust.* The Trustee shall be made the owner and beneficiary of the policy [sic] or policies on the life of grantor, listed on Schedule A, attached.
>
> The Trustee shall have the right to exercise, for or on behalf of the income

For a number of months after the merger, there was a flurry of paperwork between the O'Daniel, Pillsbury, and the insurance companies. The record contains specific details related only to one of the twelve life insurance policies, the Northwestern policy.[8]

On November 14, 1979, O'Daniel, signing as president of the Pioneer Foods division of Pillsbury, wrote the Northwestern National Life Insurance Company and requested the cash value, loan value, and possible interest on the life insurance policies.[9] On January 21, 1980, another officer of Pillsbury wrote a letter to Northwestern, stating that Pioneer was now a division of Pillsbury and requesting that Northwestern send the documents necessary to transfer ownership of the policy "back to O'Daniel."

On May 20, 1980, O'Daniel wrote a check to Pillsbury in the amount of the cash surrender value of all twelve policies. On that day, O'Daniel signed a document purporting to assign the policies to O'Daniel.

On May 29, 1980, change of ownership forms were signed that switched ownership of the Northwestern policy from Pioneer to O'Daniel. One day later, O'Daniel signed a change of beneficiary form on the Northwestern policy, requesting that the beneficiary be changed to his wife as trustee of the life insurance trust. On July 24, 1980, Northwestern loaned $58,996.78 to O'Daniel

---

beneficiaries, any and all incidents of ownership in any policies of insurance owned by the Trust, including, but not limited to the right to borrow on the policies, to surrender the policies for the cash surrender value, to assign the policies as collateral for a loan, to designate the beneficiary or mode of settlement of the policies.

*Irrevocable Trust.* Grantor reserves no interest whatsoever in the above named policies and Grantor shall have no right to modify, alter, amend or revoke this Trust Agreement in whole or in part or in any manner.

*Applicable Law; Rules of Construction.* All questions pertaining to this Trust, its validity, construction and administration, shall be determined in accordance with the laws of the state of Arkansas....

[8]There are twelve policies in dispute: one issued by the Northwestern National Life Insurance Company, three by the American Amicable Life Insurance Company, four issued by the United Founders Life Insurance Company, and four by the Progressive National Life Insurance Company.

[9]He requested information on four Northwestern life insurance policies, only one of which is at issue here.

on the Northwestern policy. On September 24, 1980, O'Daniel signed an insurance form requesting that ownership of the Northwestern policy be transferred from him to his wife as trustee. Between May and September 1980, the insurance company records for all twelve policies were changed to reflect a change in ownership from Pioneer to O'Daniel, a change in beneficiary from Pioneer to the life insurance trust, and finally a change in ownership from O'Daniel to the life insurance trust.

Until the quarter ending December 31, 1980, O'Daniel did not report that he had made any gifts to the trust. For that quarter, O'Daniel filed a quarterly gift tax return on which he reported that he had made a gift to the insurance trust in the amount of premiums he had paid on the life insurance policies.[10]

Subsequently, O'Daniel filed federal gift tax returns for the quarters ending March 31, 1981, and June 30, 1981. On these returns, he reported gifts to the trust in the amount of premium payments he had made on February 5, 1981, and May 1, 1981. O'Daniel did not report any gift tax liability for the transfer of the life insurance policies from him to the trust.

On September 18, 1982, O'Daniel died. The life insurance trust received $406,290 in proceeds from the twelve life insurance policies.[11]

### B.

The Estate filed an estate tax return on June 30, 1983. On the return, the Estate valued the gross estate at $8,160,067.65, $406,290 of which represented the proceeds of the twelve key man life insurance policies. The Estate reported on the return that $1,768,901.71 was due in federal estate tax. This balance was paid on or about the date the return was filed.[12]

In August 1983, the Internal Revenue Service ("I.R.S.") commenced an audit of O'Daniel's

---

[10]The amount of the gift was claimed to be $1,996.

[11]The trust also received $690,000 in proceeds from a group life insurance policy. These proceeds are not at issue here.

[12]Around August 16, 1983, and November 7, 1983, the Estate made additional payments of $39.44 and $7.14.

federal estate tax return and sent a bill of assessment to the Estate,[13] assessing $1,030,813.42 of additional estate taxes (taxes that the I.R.S. claimed the Estate should have recognized on the June 1983 estate tax return) and interest ("deficiency interest") of $461,479.00.[14] The total bill of $1,492,163.84 was paid in full by the Estate on November 11, 1986.[15]

## C.

In July 1989, the Estate filed suit in federal district court, seeking a refund of federal estate taxes and deficiency interest. In July 1991, the Estate and the I.R.S. reached a partial compromise in which the Estate received a $819,616.95 tax refund, a $366,969.05 deficiency interest refund, and $739,000 of statutory interest.[16]

On April 23, 1992, the court awarded the Estate a $915,756.34 estate tax refund and a $94,555.49 deficiency interest refund, plus statutory interest. The court held that O'Daniel had purchased the key man insurance policies from Pillsbury at the closing of the Pioneer-Pillsbury merger on June 29, 1979, that O'Daniel had transferred all incidents of ownership in those policies to the life insurance trust on July 8, 1979, more than three years from the date of his death, and that the proceeds of the policies should be excluded from the Estate. The district court also held that the Estate was not entitled to deduct, as an administrative expense, the interest payments that had been refunded or that will be refunded to the Estate once its estate tax liability is finally determined.

---

[13]On June 19, 1986, the I.R.S. had issued a notice of deficiency, contending that the Estate owed an additional $1,583,836 (adjusted for a credit for the Arkansas state death tax.). Instead of contesting the deficiency in the United States Tax Court, the executors of the Estate opted to pay the tax and then sue for a refund.

[14]Unless otherwise noted, statutory references are to the Internal Revenue Code of 1954, as in effect on September 18, 1982, the day O'Daniel died. Section 6601(a) reads,

> If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

[15]This figure was arrived at by subtracting a credit for payment received from the Estate of $128.58.

[16]Statutory interest is interest on amounts the Estate overpaid in 1986. *See* § 6611.

The government appealed on the basis that the life insurance policies were includable in the estate. The Estate cross-appealed, claiming that refunded deficiency interest should be deducted from the value of the gross estate.

II.

The first issue is whether the proceeds of the twelve life insurance policies constitute part of the "value of the gross estate." Section 2035(a) provides that the gross estate includes any transfers of interests in property made by the decedent to another party during the three years preceding death.[17] For persons who died after December 31, 1981, § 2035(d)(1) limits the application of §

_____

[17]Section 2035 reads,

§ 2035. Adjustments for gifts made within 3 years of decedent's death

(a) Inclusion of gifts made by decedent.—Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death.

(b) Exceptions.—Subsection (a) shall not apply—

(1) to any bona fide sale for an adequate and full consideration in money or money's worth, and

(2) to any gift to a donee made during a calendar year if the decedent was not required by section 6019 (other than by reason of section 6019(a)(2)) to file any gift tax return for such year with respect to gifts to such donee.

Paragraph (2) shall not apply to any transfer with respect to a life insurance policy.

(c) Inclusion of gift tax on certain gifts made during 3 years before decedent's death.—The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse after December 31, 1976, and during the 3-year period ending on the date of the decedent's death.

(d) Decedents dying after 1981.—

(1) In general.—Except as otherwise provided in this subsection, subsection (a) shall not apply to the estate of a decedent dying after December 31, 1981.

(2) Exceptions for certain transfers.—Paragraph (1) shall not apply to a transfer of an interest in property which is included in the value of the gross estate under section 2036, 2037, 2038, 2041, or 2042 or would have been included under

2035(a) to cases in which (1) the transferred interest in property is included in the gross estate under sections 2036, 2037, 2038, or 2042, or (2) the transferred interest in property would have been included under any of such sections if such interest had been retained by the decedent (until death).

Under § 2042, the gross estate includes the proceeds of life insurance on the decedent's life if the decedent possessed, at death, an incident of ownership in the policy.[18] By regulation, "incidents of ownership" are defined as the economic benefits of owning an insurance policy. An economic benefit includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy or revoke an assignment, to pledge the policy for a loan, or to obtain a loan from the insurer for the surrender value of the policy. 26 C.F.R. § 20.2042-1(c)(2).

The interaction between sections 2035 and 2042 can be stated thusly: The proceeds of an insurance policy insuring O'Daniel's life are part of his gross estate if O'Daniel transferred any incidents of ownership in the policy at any time during the three-year period before his death. *See Estate of Perry v. Commissioner,* 927 F.2d 209 (5th Cir.1991). The district court held that he did not:

> The $406,290 in proceeds of these life insurance policies are excluded from Mr. O'Daniel's gross estate under Internal Revenue Code Sections 2035(a) and (d) because Mr. O'Daniel irrevocably transferred all of his incidents of ownership in the policies to the Finis A. O'Daniel insurance trust more than three years before his death.

We affirm this determination. The district court characterized the events in question as follows: (1) On June 29, 1979, Mr. O'Daniel purchased the insurance policies from Pioneer. (2) On July 8, 1979, O'Daniel gave the policies to the life insurance trust. As we will explain, under this depiction all incidences of ownership were transferred by O'Daniel more than three years before his

---

any of such sections if such interest had been retained by the decedent.

As amended Aug. 13, 1981, Pub.L. No. 97-34, title IV, §§ 403(b)(3)(B), 424(a), 95 Stat. 301, 317.

Section 2035 often has been criticized as poorly drafted. *See* BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 126.4.2 (1993).

[18]Proceeds that are payable to the estate are automatically included in the value of the gross estate. § 2042(1). The proceeds of the life insurance policies were not paid to the Estate, however, but to O'Daniel's wife as trustee of the life insurance trust.

death.

## A.

In determining whether O'Daniel transferred all incidents of ownership before three years of his death, it is crucial to determine whether the policies were transferred from Pillsbury to O'Daniel at the time of the merger. If O'Daniel did not receive ownership from Pillsbury in a valid transaction, O'Daniel could not later have transferred ownership to the trust.

With the exception of the statute of frauds defense, the oral agreement is a valid contract under Arkansas law.[19] Plowman, Levin, and Giroir all testified that there was an oral agreement providing that Pillsbury would sell the policies to O'Daniel at the time of the merger. Under Arkansas law, an oral agreement to assign or sell insurance policies is valid against third parties. *Munn v. Robison,* 203 F.2d 778, 781 (8th Cir.1953); *Webster v. Telle,* 176 Ark. 1149, 6 S.W.2d 28, 32 (1928).

Also, under Arkansas law, a sale of personal property worth over $5,000 is unenforceable under the statute of frauds. Therefore, the oral agreement for Pillsbury to sell the insurance policies to O'Daniel is unenforceable.[20] As a result, if Pillsbury had refused to turn over the life insurance

---

[19]It is true that O'Daniel did not pay for the policies until May 1980. This does not necessarily mean that ownership of the policies did not change hands until then, however. Suppose a person makes an oral agreement to purchase a truck and to pay for it at a later date. If the truck is stolen from the buyer's home a few hours later, the buyer still is liable for payment. *Gilmer v. Floyd Mayton, Inc.,* No. CA 85-209, 1986 WL 4552 (Ark.Ct.App.1986).

The government argues that Pillsbury did not document its assignment of the policies until 1980. This lack of documentation, however, did not prevent the oral agreement from giving O'Daniel ownership rights at the time of the merger.

The government argues that the oral agreement did not specify the exact price at which O'Daniel would buy the policies. The agreement was that O'Daniel would purchase the policies for the then undetermined cash surrender value of the policies. Merely because a contract leaves the price open does not negate its validity.

[20]The Estate argues that partial performance by Pillsbury—that it merged with Pioneer—takes the oral contract out of the statute of frauds. But the oral contract did not require the merger; it merely stated that once the merger occurred, Pillsbury would sell the insurance policies to O'Daniel. Thus, the merger was not part of the contract, but merely a contingent event.

The Estate contends that the statute of frauds is inapplicable because the parties later documented and evidenced the oral contract. This may be true, but the documents were signed too late to make the contract enforceable before the three-year period began

policies to O'Daniel during the relevant time period, O'Daniel would not be able to sue to obtain a judgment for breach of contract. *See* 2 CORBIN ON CONTRACTS § 279, at 21 (1950).

Even though the oral agreement was unenforceable, it still was valid for the purpose of the incidents-of-ownership test. In *Camp v. Commissioner,* 21 B.T.A. 962 (1930), the Board of Tax Appeals held that when land is sold pursuant to an agreement violating the statute of frauds, any subsequent income arising from the land is taxable to the buyer, not to the seller.[21] By analogy, an oral agreement, although unenforceable under the statute of frauds, can transfer all incidents of legal ownership from Pillsbury to O'Daniel within the meaning of § 2035.[22] The I.R.S. is a third party and cannot assert the statute of frauds to void the contract.

The district court may have erred technically in characterizing the oral agreement as "enforceable."[23] Nonetheless, the agreement was valid for the purpose of determining the value of

---

on September 18, 1979.

[21]*See also Charlotte Union Bus Station v. Commissioner,* 209 F.2d 586, 589 (1954) ("There is no basis in law or in reason for permitting the government, in order to tax non-existent income, to invoke the statute of frauds and repudiate, on the basis of the statute, contracts which a taxpayer has made in good faith and under which he has surrendered the right to receive the income which it is proposed to tax."); *Fraser v. Commissioner,* 64 T.C. 41, 47, 1975 WL 3036 (1975); *Newlin Machinery Corp. v. Commissioner,* 28 T.C. 837, 844, 1957 WL 1105 (1957); *Wheelock v. Commissioner,* 16 T.C. 1435, 1442, 1951 WL 187 (1951).

[22]Section 2038 provides that property transferred by the decedent is taxable if the transfer is revocable during the three-year period before the decedent's death. § 2038(a)(1). Section 2038 is inapplicable, though, because it applies only if the transfer is revocable under the terms of the transfer instrument. Section 2038 does not apply to the successful use of the statute of frauds defense.

[23]The court found that

> [a]s part of the June 29th, 1979 merger between Pioneer and Pillsbury, it was agreed between Pillsbury and Mr. Finis O'Daniel that Pillsbury would sell and Mr. O'Daniel would purchase all interests that Pillsbury and Pioneer owned in the $406,290 of insurance policies and that in due course Mr. O'Daniel or his transferee would pay Pillsbury money equal to the cash surrender value of the policies with the insurance company's change-of-beneficiary and change-of-owner paperwork to be concluded at some time after the merger. The agreement between Pillsbury and Mr. O'Daniel, although oral, was binding and enforceable as of the time of the merger between Pillsbury and Pioneer.

Estate.[24]

B.

Having determined that the policies were transferred from Pillsbury to O'Daniel at the time of the merger, we must decide whether O'Daniel transferred all incidents of ownership to the life insurance trust on July 8, 1979. We conclude that the trust agreement operated to transfer all incidences of ownership to the trust.

The government makes two arguments why O'Daniel still retained incidents of ownership in the policies despite the signing of the trust agreement on July 8, 1979. First, the government argues that O'Daniel failed to pay a gift tax on his gift of the insurance policies to the trust on that date. Despite the fact that the policies had a cash value of over $100,000, O'Daniel did not report any such gift on his gift tax return for the appropriate quarter (the quarter ending September 30, 1979). Although O'Daniel's failure to pay a gift tax may help prove a gift was never made, it does not establish that the gift was made later rather than sooner.

Second, the government argues that O'Daniel withdrew the cash surrender values on all policies in 1980.[25] This withdrawal, the government argues, was an exercise of O'Daniel's incidents of ownership over the policies. The Estate replies that the withdrawal took place in O'Daniel's capacity as the agent for his trust, rather than for his own personal benefit.

The Estate notes that there were three possible ways for O'Daniel to have paid Pillsbury for the insurance policies. First, Pillsbury could have drawn down the cash values and and then transferred the policies directly to the trust. Second, the trust could have paid Pillsbury directly with the cash values of the policies. Third, O'Daniel could have paid Pillsbury and then repaid himself out of the withdrawal of cash values from the policies. The Estate argues that the third possibility was

---

[24]As we ultimately conclude, the oral agreement—combined with the trust agreement—was effective in transferring all incidents of ownership from the estate more than three years before O'Daniel's death. Therefore, the district court ultimately was correct in concluding that the Estate possessed no incidents of ownership.

[25]For example, on July 24, 1980, Northwestern issued O'Daniel a policy loan check of $58,996.78 on the Northwestern policy. Apparently, this loan was, in effect, the same as if O'Daniel had withdrawn the cash value from the Northwestern policy.

the easiest.

No matter how practical it was for O'Daniel to write a check to Pillsbury and then later withdraw the cash values from the policies, O'Daniel may have violated Arkansas law by doing so. Although O'Daniel could have drawn down the cash values himself during his period of ownership (from June 29, 1979, to July 8, 1979), he actually drew down the cash values on July 24, 1980, when, according to the Estate, the policies were owned by the life insurance trust, not by O'Daniel. Although the Estate argues that O'Daniel withdrew the cash as agent for the life insurance trust, the record reveals no appointment of O'Daniel as an agent. Even if he was an agent of the trust, O'Daniel arguably breached his fiduciary duty to the trust by drawing down the cash values of the policies, which at the time were assets of the trust.

The Estate seems to argue that this payment from the trust to O'Daniel was part of the overall scheme whereby O'Daniel would pay Pillsbury with money derived by withdrawing money from the insurance policies. Although it is true that the oral agreement contemplated that O'Daniel would pay Pillsbury the cash values, it did not specify that O'Daniel would withdraw the cash values. Thus, the withdrawal may have been illegal.

Even if O'Daniel acted illegally in withdrawing money from the insurance policy, however, he did not exercise incidents of ownership within the meaning of § 2042. Incidents of ownership connote the legal power to exercise ownership, not the decedent's practical ability to do so. As the Tax Court stated in *Estate of Bartlett,* 54 T.C. 1590, 1598, 1970 WL 2411 (1970),

> While the insured could possibly have cashed in some of the policies or could have exercised a second assignment with notice thereof to the insurers, any such action on his part would have constituted a breach of the trust agreement and would have amounted to fraud against the bank, as assignee and trustee. "Incidents of ownership" are to be measured by a "general, legal power to exercise ownership without regard to the owner's ability to exercise it at a particular moment." *Commissioner v. Estate of Noel,* 380 U.S. 678, 684 [85 S.Ct. 1238, 1241, 14 L.Ed.2d 159] (1965).

Even though O'Daniel possessed and exercised the practical ability to withdraw the cash value of the insurance policies, he did not possess a legal incident of ownership over the policies during the three years before his death. Therefore, the proceeds of the twelve key man life insurance policies should have been excluded from his estate.

III.

We conclude that the Estate cannot deduct subsequently refunded deficiency interest expenses from the gross value of the estate. In 1983, the Estate filed a federal estate tax return and paid the estate tax liability reported thereon. In 1986, the I.R.S. assessed additional estate taxes, effectively claiming that the Estate owed more than it had reported on its 1983 return. The I.R.S. also assessed interest against the estate for the period from the date the I.R.S. claimed the tax should have been paid originally (on June 30, 1983) until the actual payment of the additional tax (on November 11, 1986).[26]

The Estate paid both the additional tax and the deficiency interest. Later, the Estate was refunded a portion of the additional tax as well as the corresponding deficiency interest.[27] The district court held that the Estate is not entitled to deduct the amount of deficiency interest from the gross value of the Estate, even though some of the deficiency interest was eventually refunded (or will be refunded).

The federal estate tax is a tax on the decedent's entire taxable estate. § 2051. The value of the taxable estate is determined by deducting, from the value of the gross estate, funeral expenses, administration expenses, claims against the estate, and certain unpaid mortgages. § 2053(a).[28]

---

[26]*See* § 6601.

[27]The Estate is entitled to a tax refund, both as a result of a partial settlement agreement with the government in May 1991 and as a result of the judgment of the district court in April 1992. Both the I.R.S. and the State of Arkansas refunded or will refund taxes.

[28]Section 2053(a) states,

> (a) General Rule.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—
>
> (1) for funeral expenses,
>
> (2) for administration expenses,
>
> (3) for claims against the estate, and
>
> (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,

Administrative expenses include only "such expenses as are actually and necessarily incurred in the administration of the decedent's estate." 26 C.F.R. § 20.2053-3.

Whether an expense is an administrative expense is a question of federal law. *Pitner v. United States,* 388 F.2d 651, 659 (5th Cir.1967). Some authorities have held that deficiency interest on a federal estate tax deficiency that accrues after the decedent's death is a deductible expense. *E.g.,* Rev.Rul. 79-252, 1979-2 C.B. 333. The government contends that the interest is deductible, but only if it remains unrefunded.

The refunded deficiency interest is not an expense that has been "actually" incurred. Refunded interest payments do not diminish the value of the Estate. Therefore, the Estate should not deduct the amount of the refunded deficiency interest.

Surprisingly, there are no published opinions that deal with this issue. The closest authority is Rev.Rul. 77-274, which holds that a deduction for funeral expenses must be reduced by the amount of any award of funeral expenses in a state wrongful death action.[29] Only the net outlay is "actually" expended by the estate:

> Thus, since any damages recovered under the statute for funeral expenses are in reality remuneration for the financial loss sustained, any funeral expenses to the extent of such recovery cannot be considered to be "actually expended" as required by section 20.2053-2 of the regulations.

1977-2 C.B. 326; *see also* Rev.Rul. 66-234, 1966-2 C.B. 436.

If this were an income tax case, the result would be different. An income tax deduction would be taken in the year the taxpayer pays the deficiency interest.[30] Income would be recognized in the year the interest is refunded. Because the deduction would be taken in the previous taxable year, it would not be disturbed by the subsequent refund. *See Klinghamer v. Brodrick,* 242 F.2d 563, 564

---

> as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.
>
> ....

[29]An analogy can also be made to § 2054, which provides that an estate is allowed an estate tax deduction for casualty losses, but only if the losses are "not compensated for by insurance or otherwise."

[30]This assumes, *arguendo,* that the taxpayer is entitled to a deduction.

(10th Cir.1957).

In contrast, a deduction from the estate tax does not hinge upon the concept of the tax year. Therefore, the refunded deficiency interest should be netted against the original interest payment, resulting in an estate tax deduction of zero.

The Estate argues that reducing its estate tax deduction by the amount of the interest refund would result in unfairness. The Estate avers that it also will have to pay *income tax* on the interest refund.[31] In effect, the Estate argues, the refund will be taxed twice. This anomaly, if it exists, should be corrected by Congress, not by this court.

For the foregoing reasons, we reject the arguments made by the government, as appellant, and the Estate, as cross-appellant. The judgment is AFFIRMED.

* * * * * *

* * * * * *

* * * * * *

---

[31]The Estate argues that it would not be protected by the tax benefit rule, which applies only to amounts actually deducted, as opposed to amounts that could have been deducted.