[No. H021933. Sixth Dist. Feb. 4, 2002.]

MARLYN A. CROOK, as Trustee, etc., et al., Plaintiffs and Respondents,
v.
LOUIE G. CONTRERAS, as Trustee, etc., Defendant and Appellant.

[No. H021934. Sixth Dist. Feb. 4, 2002.]

Estate of FLORENCE L. KOUBA, Deceased.
MARLYN A. CROOK, Petitioner and Respondent,
LOUIE G. CONTRERAS, Objector and Appellant.

## COUNSEL

Weinberg, Ziff & Miller, Michael Patiky Miller; Dozier & Dozier and James H. Dozier for Objector and Appellant and for Defendant and Appellant.

Michael G. Desmarais for Petitioner and Respondent and for Plaintiffs and Respondents.

## OPINION

**MIHARA, J.**—Appellant Louie G. Contreras (hereafter Contreras) has two appeals before this court regarding the same set of 1998 documents signed

by the decedent. In one appeal (H021934), he claims that these documents are valid codicils to the decedent's 1988 will exercising her power of appointment over assets in a 1988 trust. In the other appeal (H021933), he argues that these same documents are valid amendments to the 1988 trust permitting her to exercise her power of appointment by an instrument other than a will and exercising that power of appointment. His arguably inconsistent positions were rejected by the trial court. We affirm the trial court's orders.

BACKGROUND

On October 18, 1988, decedent Florence L. Kouba (hereafter Florence) and her husband, Lumir Kouba (hereafter Lumir), established an inter vivos family trust with themselves as both trustors and trustees. Section 1.08 of the trust governed "Revocation of Trust." "At any time and from time to time *during the joint lives of the Trustors*, the Trustors jointly as to community property and either Trustor as to his or her separate property may, by serving written notice on the Trustee, revoke the trust created by this Declaration in whole or in part." (Italics added.) Section 1.09, which immediately followed section 1.08, governed "Modification of Trust." "At any time and from time to time *during the joint lives of the Trustors*, the Trustors jointly as to community property and either Trustor as to his or her separate property may, by serving written notice on the Trustee, alter, modify, or amend the trusts created by this Declaration in any respect." (Italics added.) Section 1.10, the next section of the trust, was entitled "Trusts Irrevocable on Death of First Trustor." It provided that "[e]xcept as otherwise expressly provided in this Declaration, on the death of either Trustor the trusts created by this Declaration shall become irrevocable and not subject to amendment or modification."

Article 3 of the trust provided that, upon the death of the first trustor, the trust would divide into two trusts, "Trust A" and "Trust B." Trust A would consist of the surviving trustor's interest in the property in the trust estate and as much of the other assets in the trust that qualified for the federal estate tax marital deduction as would minimize federal estate taxes. Trust B would contain the remaining assets in the trust. The surviving trustor was to receive all income from both Trust A and Trust B. Section 3.06 granted the surviving trustor the "Power to Make Withdrawals from Trust A." "After the death of the first of the Trustors to die, the Surviving Trustor may at any time and from time to time withdraw such amounts, up to the whole thereof, from the principal of Trust Estate of Trust A as such Surviving Trustor may at the time of any such withdrawal, designate in a written notice served on the Trustee."

Article 4 of the trust governed "DISTRIBUTIONS ON DEATH OF SURVIVING TRUSTOR." Section 4.01 of article 4 provided for the "Survivor's Power to Appoint Trust A." "On the death of the last Trustor to die, herein called 'Surviving Trustor', the principal of Trust A and any accrued or undistributed net income from the principal of Trust A shall be distributed by the Trustee in such manner and to such persons . . . as the Surviving Trustor shall appoint and direct by specific reference to this power of appointment in his or her last Will admitted to probate by a court of competent jurisdiction." Section 4.02 provided that the surviving trustor's failure to exercise the power of appointment would cause the principal and income in Trust A to become part of Trust B. The trust provided that Trust B would be distributed upon the death of the surviving trustor to specific beneficiaries. Article 6, section 6.07 provided that, upon the death of the surviving trustor, the trustees of the trust would be "Marlyn Kouba Crook" and Katherine Kress Brown. The assets placed in the trust included the home in which Lumir and Florence resided at 1902 Golden Way in Mountain View.

Later on the same day that she and Lumir established the trust, Florence executed a will.[1] In this will, she expressly stated "I do not intend to exercise any power of appointment which I now have or which may hereafter be conferred on me, unless that power is specifically referred to herein, or in any Codicil hereto." This will provided that Florence's estate, including her household furnishings, would be placed in the family trust. The will named Crook as executor of Florence's estate. Florence's will also contained a no contest clause. "If any beneficiary under this Will in any manner, directly or indirectly, contests or attacks this Will or any of its provisions, any share or interest in my estate given to that contesting beneficiary under this Will is revoked and shall be disposed of in the same manner provided herein as if that contesting beneficiary had predeceased me without issue."

Lumir died in 1991. On March 11, 1998, Florence signed a document that purported to be an amendment to the 1988 trust. This document purported to amend "Article IV Section 4.01" of the trust so as to provide that Florence's power of appointment could be exercised not only by will but also "by any type of writing indicating exercise of this power of appointment." The document also purported to amend the trust to add to section 4.01 the following text: "(b) On the death of the Surviving Trustor the trustee is directed to use such assets in Trust A as needed to purchase from Trust B Trustor's family home known as 1902 Golden Way, Mountain View, California. Thereafter the trustee is directed to deed trustor's family home to

---

[1]Both the trust and the will were prepared by Attorney James H. Dozier. Dozier also prepared the 1998 purported trust amendments and/or codicils. He represents Contreras in this appeal.

LOUIE G. CONTRERAS. Louie G. Contreras has taken good care of Trustor for the past few years and for that loyal service Trustor wishes him to have her family home when she passes on. As indicated above, Trustor hereby exercises this power of appointment." In addition, the document purported to amend section 6.07 of the trust to nominate Contreras as trustee of the trust after Florence's death. At the end of the document, Florence signed "this amendment" as both trustor and trustee. Her attorney, James H. Dozier, affixed a notary acknowledgement to the end of the document, which he signed as a notary.

On August 12, 1998, Florence executed another document similar to the first purported amendment to the trust, which purported to be a "second" amendment to the trust. Again, the document purported to amend section 4.01 of the trust in essentially the same respects except that it included household furnishings with the family home. Again, Florence signed the "amendment" as both trustor and trustee, and Dozier signed an attached notary acknowledgement as a notary.

Florence died on January 27, 2000. On March 6, 2000, Dozier and Usha Kelkar signed their names to attestations that Florence had signed the purported 1998 trust amendments with the understanding that each of these "amendment[s]" was "her testamentary instrument." Dozier attached these attestations to the purported amendments. On March 7, 2000, Dozier executed a "Proof of Subscribing Witness" form in which he declared, under penalty of perjury, that, when Florence signed the 1998 documents, she "acknowledged in the presence of the attesting witnesses . . . that the instrument signed was decedent's . . . codicil."[2] Dozier also declared that "[w]hen I signed the instrument, I understood that it was decedent's . . . codicil."

On March 8, 2000, Contreras filed a petition for admission to probate of Florence's 1988 will and the two 1998 documents that he alleged were codicils to Florence's will. On April 21, 2000, Crook filed a petition seeking a determination that her opposition to probate of the purported codicils and her challenge to the validity of the same documents as trust amendments would not be "contests" of Florence's will. Crook intended to file an opposition to probate of the 1998 documents as codicils and a petition to determine the validity of these documents as trust amendments. Contreras responded by asserting that her proposed opposition and petition would be contests of Florence's will.

On April 25, 2000, Crook filed a petition seeking to suspend Contreras's powers as trustee and a petition seeking removal of Contreras as trustee of

---

[2]The record does not contain any such declaration by Kelkar.

the trust. The court immediately suspended Contreras's powers as trustee pending a hearing on the petition for removal. On June 26, 2000, after a hearing on the petition for removal, the court removed Contreras as trustee based on its finding that Florence did not have the power to change the successor trustee designated in the 1988 trust. Crook and Brown were appointed trustees of the trust as designated in the 1988 trust.

At the same hearing, the court determined that Crook's opposition to the admission of the documents as codicils and her petition to determine the validity of the documents as trust amendments would not be contests of Florence's will. "I just don't think documents executed ten years after a[n] initial estate plan constitute, by case law, an integrated estate plan, and, therefore, that absent a[n express] republication of the original document having the no-contest provision, a petition contesting the validity of the documents prepared ten years after the fact does not violate the no-contest clauses of the 1988 will."

Crook then proceeded with both her opposition to probate of the documents as codicils and her petition to determine the validity of the documents as trust amendments. Her opposition challenged the admission of the documents as codicils on the ground that they had not been signed by two witnesses in accordance with Probate Code section 6110, and her petition disputed the validity of the documents as trust amendments because Florence lacked the power under the trust to amend the trust. Contreras filed a reply to her opposition in which he asserted that, "[i]f an instrument has a testamentary intent and was signed by a competent testator in the presence of two witnesses, this instrument meets the modern test for admission into probate." Contreras's opposition to Crook's petition was based on his contention that Florence had the power to modify the trust notwithstanding language in the trust to the contrary because she had a power to withdraw that was ipso facto a power to revoke that necessarily included a power to modify.

Both Contreras's petition for admission of the will and purported codicils to probate and Crook's petition to determine the validity of the 1998 documents as trust amendments were heard on July 26, 2000. Contreras argued at the hearing both that the 1998 documents were valid trust amendments and that they were codicils to Florence's 1988 will. The court concluded that the power to withdraw did not make the explicitly irrevocable trust revocable and therefore the 1998 documents were not valid trust amendments. The court also determined that the 1998 documents did not validly exercise the testamentary power of appointment because "they were not validly executed by the witnesses at or about the time of their execution . . . ."

The court entered separate orders denying admission of the 1998 documents to probate as codicils and determining that the documents were not valid trust amendments. Contreras filed a timely notice of appeal challenging both the court's determination that Crook's opposition and petition would not be contests and the court's order denying admission of the documents to probate as codicils. He filed a separate timely notice of appeal from the court's determination that the documents were not valid trust amendments and the court's order removing him as trustee of the trusts. He has abandoned on appeal his contention that the court erred in removing him as trustee.

### Discussion

#### A. *Determination That Crook's Actions Were Not "Contests"*

■ Contreras argues that the trial court erred in determining that Crook's petition and opposition were not "contests" to Florence's will. He also asserts that Crook's petition to remove him as trustee was a "contest."

Contreras lacks standing to appeal the trial court's order determining that Crook's actions were not "contests" because he cannot establish that he is aggrieved by this order. ■ "Any party aggrieved may appeal . . . ." (Code Civ. Proc., § 902.) "One is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment. . . . Appellant's interest ' "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." ' " (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953], citations omitted.) "And as to the question who is the party *aggrieved*, the test . . . seems to be the most clear and simple that could be conceived. *Would the party have had the thing, if the erroneous judgment had not been given?* If the answer be yea, then the person is the 'party aggrieved.' But his right to the thing must be the immediate, and not the remote consequence of the judgment, had it been differently given." (*Adams v. Woods* (1857) 8 Cal. 306, 315.)

■ Here, a determination that Crook's actions *were* "contests" to Florence's will would not have benefitted Contreras. Crook was a beneficiary of Trust B and the executor of the will. Contreras was neither a beneficiary of Trust B nor a devisee under the will. While the success of Contreras's claims would have reduced Crook's share of Trust B, the forfeiture of her interest in Trust B would not have produced any pecuniary benefit to Contreras. Hence, he is not aggrieved by the court's order determining that Crook's actions were not "contests," and his purported appeal from this order must be dismissed.

### B. *1998 Documents Were Not Valid Codicils to Florence's 1988 Will*

Contreras maintains that the 1998 documents that purported to be trust amendments were actually codicils to Florence's 1988 will that validly exercised her power of appointment over the assets in Trust A. Crook argues that these documents were not valid codicils because they were not signed by two witnesses, in accordance with Probate Code section 6110. Contreras responds that it was sufficient that one witness signed the alleged codicils prior to Florence's death so long as the other witness signed the alleged codicils thereafter.

This debate is necessary because, under the 1988 trust, Florence could only exercise her power of appointment by a will. The 1998 documents purported to exercise this power of appointment. "Except as otherwise provided in this part, if the creating instrument specifies requirements as to the manner, time, and conditions of the exercise of a power of appointment, the power can be exercised only by complying with those requirements." (Prob. Code, § 630, subd. (a).) "(a) Where an appointment does not satisfy the formal requirements specified in the creating instrument as provided in subdivision (a) of Section 630, the court may excuse compliance with the formal requirements and determine that exercise of the appointment was effective if both of the following requirements are satisfied: [¶] (1) The appointment approximates the manner of appointment prescribed by the donor. [¶] (2) The failure to satisfy the formal requirements does not defeat the accomplishment of a significant purpose of the donor." (Prob. Code, § 631, subd. (a).)

Probate Code section 631 may excuse compliance with "donor-imposed requirements that exceed the requirements imposed by law for the appointment instrument," but "section 631 cannot be used to excuse the failure to satisfy legal requirements." (*Catch v. Phillips* (1999) 73 Cal.App.4th 648, 655-656 [86 Cal.Rptr.2d 584].) "[A] power to be exercised by will must, in fact, be exercised by a will." (*Catch*, at p. 659.) Contreras does not challenge these principles, but he claims that the 1998 documents *did comply* with the legal requirements to qualify as a will.

" 'Will' includes codicil and any testamentary instrument which merely appoints an executor or revokes or revises another will." (Prob. Code, § 88.) " ' "[T]he true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property to accrue and take effect only upon his death and passing no present interest." . . .' " (*Estate of Spitzer* (1925) 196 Cal. 301, 307-308 [237 P. 739], citation and italics omitted.) Hence, although

the 1998 documents were titled as trust amendments, they could potentially qualify as codicils if they met the legal requirements for wills and demonstrated Florence's intent to dispose of property upon her death.

"Unless there is a contest of a will: [¶] (a) The will may be proved on the evidence of one of the subscribing witnesses[3] only, if the evidence shows that the will was executed *in all particulars* as prescribed by law. [¶] (b) Evidence of execution of a will may be received by an affidavit of a subscribing witness to which there is attached a photographic copy of the will, or by an affidavit in the original will that includes or incorporates the attestation clause." (Prob. Code, § 8220, italics added.) Crook did not file a "contest" to Florence's will. Instead, she merely opposed Contreras's petition for admission of the purported codicils to probate.

The only issue here is whether the 1998 documents complied "in all particulars" with the legal requirements necessary to qualify as codicils. It was undisputed that, although both Dozier and Kelkar saw Florence sign the documents, only Dozier signed the documents at or about the times of their executions. Two years after the first 1998 document was executed, a year and a half after the second 1998 document was executed and a month *after Florence's death,* both Kelkar and Dozier signed attestations that Dozier attached to the 1998 documents. Dozier then submitted the 1998 documents with the attestations and his own affidavits as a subscribing witness in support of Contreras's petition for admission of the 1998 documents to probate as codicils.

The trial court determined that the undisputed facts did not establish compliance with the legal requirements necessary to qualify the 1998 documents as codicils to Florence's 1988 will because these documents had not been signed by two witnesses as required by Probate Code section 6110. ▮ "The construction of a statute and its applicability to a given situation are matters of law to be determined by the court." (*Estate of Madison* (1945) 26 Cal.2d 453, 456 [159 P.2d 630].) We review such matters de novo. (*Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825].)

"(a) Except as provided in [part 1 of division 6 of the Probate Code], a will shall be in writing and satisfy the requirements of this section. [¶] (b) The will shall be signed by one of the following: [¶] (1) By the testator. [¶] . . . [¶] (c) *The will shall be witnessed by being signed by at least two persons* each of whom (1) being present at the same time, witnessed either the signing of the will or the testator's acknowledgment of the signature or of

---

[3]"A subscribing witness is one who sees a writing executed or hears it acknowledged, and at the request of the party thereupon signs his name as a witness." (Code Civ. Proc., § 1935.)

the will and (2) understand that the instrument they sign is the testator's will." (Prob. Code, § 6110, italics added.)

The current version of Probate Code section 6110 is the product of a 1983 revision. Prior to 1983, the two subscribing witnesses were required to sign the will *in the testator's presence*. This requirement was eliminated by the 1983 revision. ██ Contreras argues that the 1983 revision not only eliminated the requirement that the witnesses sign the will *in the presence of the testator*, but also eliminated any requirement that the witnesses sign the will *during the testator's lifetime*. We are not aware of any California cases addressing the question of whether Probate Code section 6110 permits postdeath subscription of a will, nor have the parties directed us to any California authority on this subject. Instead, they have directed our attention to out-of-state cases addressing similar issues.

Our review of these out-of-state cases discloses no substantial support for Contreras's position. One vintage New York case cogently explains the reasons for disallowing subscription of a codicil or will after the death of the testator. " 'The statute requires that a will shall have at least two witnesses, and they must, we think, become such during the lifetime of the testator. If the act of subscribing by the witnesses can be performed immediately after the death of the principal, and the instrument be valid, it may be done in a month or a year thereafter with the same effect. A will takes effect at the instant the testator dies. If the contention of the appellants should prevail, the anomaly might be presented of the disposition of an estate being suspended intermediate the death of the testator and the time the witness o[r] witnesses shall perform the act of subscribing their names to the instrument. The final disposition of the estate would thereby be made to depend, not solely upon the intention of the testator, but upon the will or caprice of one who had been requested to perform the very simple act of becoming a witness. The legislature never intended to give to subscribing witnesses such power. . . . A will must be a valid, perfect instrument at the time of the death of the testator. It takes effect at the instant the testator dies. If invalid then, life cannot be given to it by the act of a third party.' " (*In re Cannock's Will* (1947) 81 N.Y.S.2d 42, 42-43, quoting *Matter of Fish's Will* (1895) 34 N.Y.S. 536 [48 N.E. 1104.)

The position taken by the New York courts in these early cases has been accepted by numerous other states. In *In re Estate of Flicker* (1983) 215 Neb. 495 [339 N.W.2d 914], the Nebraska court rejected a postdeath suscription of a will. "Permitting witnesses to sign a will after the death of a testator would erode the efficacy of the witnessing requirement as a safeguard against fraud or mistake. We must bear in mind that we are dealing with an

instrument allegedly signed or acknowledged by a man who is now dead. He is not present to confirm or reject it. Requiring completion of formalities of execution prior to death is likely to minimize miscarriages of justice." (*Flicker*, at p. 915.) New Jersey, Michigan and Oregon have taken similar positions. (*Matter of Estate of Peters* (1986) 210 N.J.Super. 295 [509 A.2d 797, 802]; *Matter of Estate of Mikeska* (1985) 140 Mich.App. 116 [362 N.W.2d 906, 910]; *Rogers v. Rogers* (1984) 71 Or.App. 133 [691 P.2d 114].) The Colorado Supreme Court has also held that postdeath subscription of a will did not comply with the statutory requirements then in effect, which, like California's Probate Code section 6110, without elaboration required two witnesses to sign the will. (*Estate of Royal* (Colo. 1992) 826 P.2d 1236.)

Thus, Contreras's thesis has never been addressed in California and has been repeatedly rejected by the courts in other jurisdictions.[4] We are unpersuaded that we should chart a new course. Our independent construction of Probate Code section 6110, in light of its legislative history, discloses no indication that the Legislature intended by its 1983 statutory revision to permit postdeath subscription of a will. A conclusion otherwise would attribute to the Legislature an intent to allow the validity of a will to depend upon the will or caprice of one who had been requested to perform the very simple act of becoming a witness by allowing such a person to wait until after the testator's death to decide whether or not to subscribe his or her signature to the will. Such an interpretation would invite fraud and subvert the basic intent of will authentication requirements. We conclude that the subscription of a will by two witnesses must occur prior to the testator's death, and a will that has not been subscribed by two witnesses at the time of the testator's death neither complies nor substantially complies with Probate Code section 6110.

### C. *1998 Documents Were Not Valid Amendments of the 1988 Trust*

Contreras alternatively contends that the 1998 documents were valid amendments of the 1988 trust that altered the trust to allow exercise of

---

[4]Contreras briefly mentions a New York case that did not approve of the subscription of a will by a witness after the death of the testator but did apply the doctrine of substantial compliance to the absence of a second subscribing signature. In this New York case, a husband and wife had simultaneously executed their separate wills and both witnesses signed the wife's will but one of them failed to sign the husband's will. (*In re Kiefer's Will* (1974) 78 Misc.2d 262 [356 N.Y.S.2d 520] (*Kiefer*).) The court permitted the husband's will to be admitted to probate because the contemporaneously executed wife's will bearing both of the witnesses' signatures and the testimony of the witnesses regarding the execution of the will established substantial compliance. (*Kiefer, supra* 356 N.Y.S.2d 520.) Contreras implicitly concedes that *Kiefer* does not provide substantial support for his thesis since he devotes but a single sentence to the case. Obviously the facts of *Kiefer* distinguish it from this case. There were no other contemporaneously executed documents here that bore two subscribing signatures.

the power of appointment by means other than a will and exercised that power of appointment. The only issue presented by this argument is whether Florence had the power to amend the trust.

■ "[T]he primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor." (*Ephraim v. Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 834 [172 P.2d 501].) "The intention of the transferor as expressed in the [trust] instrument controls the legal effect of the dispositions made in the instrument." (Prob. Code, §§ 21101, 21102.) "The nature and extent of the rights retained by the trustor are to [be] measured by the four corners of the instrument." (*Heifetz v. Bank of America* (1957) 147 Cal.App.2d 776, 783 [305 P.2d 979, 62 A.L.R.2d 1403] (*Heifetz*).)

Contreras relies heavily on *Heifetz*, but it does not support his argument. *Heifetz* involved a trust created by a trust instrument that provided the trustor with " 'the right and option to cancel and revoke this trust in whole or in part . . . .' " (*Heifetz, supra,* 147 Cal.App.2d at p. 778.) The original trust instrument did not expressly provide the trustor with the right to amend or modify the trust nor did it expressly prohibit amendments or modifications. The trustor subsequently amended the trust to change some of its terms including the identities of some of the beneficiaries. This amendment also limited the revocability of the trust so that the corpus of the trust would never be less than $75,000. The amendment ratified the unamended terms of the original instrument. (*Ibid.*) A second amendment further limited revocation so that the corpus would not be less than $150,000, and again ratified the unamended terms of the original instrument. (*Heifetz,* at p. 779.)

The trust never contained a sum exceeding or equal to $150,000. (*Heifetz, supra,* 147 Cal.App.2d at p. 779.) Nevertheless, the trustor, with the consent of the primary beneficiary, her daughter, thereafter attempted to either completely revoke the trust or to eliminate all of the beneficiaries other than her daughter. (*Heifetz,* at pp. 779-780.) The trustee refused to permit her to revoke or amend, and the trial court agreed with the trustee. (*Heifetz,* at pp. 780-781.) On appeal, two questions were addressed. First, the court considered whether the explicitly reserved power to revoke in whole or part in the original trust instrument included the power to amend. (*Heifetz,* at pp. 781-782.) The parties conceded the point, and the Court of Appeal concluded that an implied power to amend was included in the explicitly reserved power to revoke in whole or part. (*Heifetz,* at p. 782.)

Second, the court addressed whether the trustor's amendments of the trust precluded her from thereafter amending or revoking the trust. The court

noted that "[t]he nature and extent of the rights retained by the trustor are to [be] measured by the four corners of the instrument. Any right of revocation or amendment found therein can be exercised lawfully by her . . . ." (*Heifetz, supra*, 147 Cal.App.2d at p. 783.) The court also relied on a California statute in effect when the trust was created that provided that a trust could be revoked with the consent of all beneficiaries unless the trust reserved the power of revocation to the trustor. (*Heifetz*, at p. 785.) The court determined that the earlier amendments did not prevent the trustor from thereafter amending the trust again. "The language of the 1928 amendment definitely attaches irrevocability to corpus of a value of $150,000 or less, but does not mention any other restriction upon the right of the trustor to deal with the trust by way of amendment." (*Heifetz*, at p. 783.) The court decided that the trustor had the power to amend the trust to eliminate all beneficiaries other than her daughter. It further concluded that the statute in effect at the time of the trust's creation permitted her to revoke the trust with her daughter's consent. (*Heifetz*, at p. 785.)

 The holding in *Heifetz* does not further Contreras's argument. In *Heifetz*, the court affirmed the principle that any right to amend or revoke must be found in the "four corners" of the trust instrument. The trust instrument in *Heifetz* contained a power to revoke in whole or in part which impliedly included the power to amend. The subsequent amendments only limited but did not eliminate the trustor's power to revoke or amend. Hence, the trustor was empowered by the trust instrument to amend the trust to eliminate the beneficiaries other than her daughter. Because, at that time, the consent of the only remaining beneficiary was statutorily sufficient to support revocation, the trustor's revocation did not conflict with the trustor's intent or the law.

Here, in contrast, the trust instrument expressly prohibited Florence from revoking, modifying or amending the trust instrument in any respect whatsoever after Lumir's death, and no statute permitted Florence to do what the trust instrument precluded. Nevertheless, Contreras argues that Florence's power to withdraw all or part of the assets of Trust A during her lifetime impliedly permitted her to revoke Trust A, and this implied power to revoke included a power to amend. The crux of his argument is his assertion that Florence's power of withdrawal gave her the power to revoke notwithstanding the trust instrument's express preclusion of revocation.

Contreras relies on a federal district court opinion from the District of Columbia. This case, *Suzan Tantleff Trusts v. F.D.I.C.* (D.D.C. 1996) 938 F.Supp. 14, 17 (*Tantleff*), which purported to apply both New York and federal law, is not helpful to Contreras's cause. In *Tantleff*, three trusts had been

established by a mother with one of her three children (and that child's issue) named as the beneficiary of each trust. (*Tantleff*, at p. 15.) The mother deposited the trust assets in an insured bank that subsequently was placed in receivership. (*Ibid.*) She initiated an action against the Federal Deposit Insurance Corporation (FDIC) after the FDIC concluded that the assets of the three trusts should be aggregated for insurance purposes thereby greatly reducing the available insurance coverage. (*Tantleff*, at p. 15.)

Federal law mandated that, in determining the amount of insurance coverage available, the FDIC "must aggregate the amounts of all deposits in the bank which are maintained by a depositor in the 'same right and capacity' for the depositor's benefit, regardless of the name on the account." (*Tantleff*, *supra*, 938 F.Supp. at p. 17.) The FDIC operated under regulations that distinguished between revocable and irrevocable trusts. (*Ibid.*) Irrevocable trusts were entitled to full insurance coverage for each beneficiary so long as the beneficiary's interest in the trust was "non-contingent." (*Ibid.*) Revocable trusts, on the other hand, were only entitled to full insurance coverage for each beneficiary if the trust satisfied a three-part test. (*Ibid.*) The FDIC's regulations excluded from the coverage of an irrevocable trust "[a]ny interest retained by the settlor." (*Ibid.*)

The trust instruments expressly stated that the trusts were irrevocable but provided the mother-trustor with the power to withdraw all or part of the trust assets at any time. (*Tantleff*, *supra*, 938 F.Supp. at pp. 15-16.) The trust instrument stated that it was governed by New York law. The district court observed that New York courts had held that a settlor's retention of the right to " 'fully withdraw all funds and thus terminate the "trust" *de facto*' . . . [was] inconsistent with an intention to create an irrevocable trust," but the court failed to note that none of the New York cases it cited had involved a trust instrument that expressly stated that the trust was irrevocable. (*Tantleff*, at p. 18, and cases cited therein.) The district court also erroneously stated that a federal appeals court had made a similar holding based on federal common law. (*Ibid.*) The federal appeals court, in the case cited by the district court, had considered a trust agreement that expressly *permitted* both revocation and withdrawal as opposed to a trust agreement that expressly *prohibited* revocation. (*Lambert v. Federal Deposit Ins. Corp.* (9th Cir. 1988) 847 F.2d 604, 607.) Hence, the district court in *Tantleff* based its decision on the fallacy that it was supported by New York and federal case law when in fact the only source that supported it was a nonauthoritative text. Needless to say, we are not persuaded that we should follow this federal district court opinion.

Contreras has cited many other out-of-state cases, but none of them support his contention. No case, other than the fatally flawed *Tantleff*, has

held that a trust instrument that *expressly stated that it was irrevocable* nevertheless created a power to revoke simply because it gave a trustor the power to withdraw all or part of the trust's assets.[5] Under California law, the existence or nonexistence of a right to revoke must be determined by examining the trust instrument and determining from language used in the instrument whether Lumir and Florence intended in 1988 to confer on Florence a right to revoke Trust A after Lumir's death. The 1988 trust instrument manifestly and unambiguously demonstrates that they did not intend to confer such a right. The trust instrument expressly states that both trusts shall be irrevocable after Lumir's death and also precludes Florence from modifying or amending either of the trusts after Lumir's death. Although, at the same time, the 1988 trust instrument gave Florence a right to withdraw trust assets from Trust A after Lumir's death, the context of the trust instrument makes it clear that Lumir and Florence did not intend thereby to obviate their express prohibitions against Florence revoking, amending or modifying either of the trusts after Lumir's death.

Since the trust instrument *expressly* deprived Florence of the power to revoke, modify or amend the trusts, she also lacked any *implied* power to do so. Consequently, the 1998 documents that purported to be trust amendments were invalid, and the trial court did not err in so ruling.

CONCLUSION

We dismiss Contreras's purported appeal from the trial court's determination that Crook's actions were not "contests" to Florence's will. We affirm the trial court's orders denying admission of the 1998 documents to probate as codicils and determining that these documents were not valid trust amendments.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied February 26, 2002, and appellant's petition for review by the Supreme Court was denied May 22, 2002. George, C. J., and Baxter, J., did not participate therein.

---

[5]One possible exception is *In re Pengelly's Estate* (1956) 374 Pa. 358 [97 A.2d 844]. Therein, a Pennsylvania court stated, without analysis, that, "under the circumstances" of the particular trust before it, the settlor's power to consume the entire principal during his lifetime amounted to a power to revoke even though the trust instrument expressly stated that the trust could be revoked only with the consent of the trustee. (*Pengelly*, at p. 847, fn. 1.) In the absence of analysis, we can find nothing in *Pengelly* to support its claim that an express power to withdraw necessarily cancels out an express statement that a trust is irrevocable.