[No. D046422. Fourth Dist., Div. One. July 6, 2006.]

LYNDA LAYCOCK, as Trustee, etc., Plaintiff and Respondent, v.
LEONARD H. HAMMER, JR., et al., Defendants and Appellants.

26

[redacted]

**COUNSEL**

Leviton Law Group and Stuart L. Leviton for Defendants and Appellants.

Glenn, Wright, Jacobs & Schell and Elaine L. Chan for Plaintiff and Respondent.

## OPINION

**BENKE, J.**—The decedent in this case, Spearl Ellison, purchased a substantial life insurance policy 13 years before his death and assigned all of his interest in the policy, including the right to any benefits, to an irrevocable life insurance trust he had established. When Ellison died the life insurance company paid $767,263.70 in death benefits to the trustee of the trust, Ellison's grandaughter, respondent Lynda Laycock.

Shortly before Ellison's death, appellants Leonard H. Hammer, Jr., Hammer Realty Group, Inc., and KanTex Hospitality, Inc. (collectively Hammer), had obtained a $4.65 million judgment against Ellison. Hammer asserted the proceeds of the life insurance policy were subject to its judgment. By way of a probate petition Laycock sought a declaration the proceeds of the life insurance policy were exempt from Hammer's claim. Laycock moved for summary judgment on her petition and the trial court granted the motion.

On appeal we affirm. By its terms the trust was irrevocable. Thus, under well-established precedent, once Ellison transferred the policy to the trust, he no longer had any ownership interest in the policy and it was not subject to the claims of his creditors.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Irrevocable Trust*

Ellison created the life insurance trust on July 14, 1989. In pertinent part the trust instrument Ellison executed states: "The Trustor hereby declares that this Trust is and shall be irrevocable and that, after the execution of this Trust, Trustor shall have no right, title or interest in, or power, privilege or incident of ownership in regard to any of property in this Trust and no right to alter, amend, revoke or terminate this Trust or any of its provisions."

On September 29, 1989, Ellison executed an "Absolute Assignment of Policy" which transferred all his "rights, titles, interests and incidents of ownership" in a policy issued by the Southwestern Life Insurance Company to the trust. On October 13, 1989, the trustee[1] of the trust was designated as the beneficiary of the policy.

---

[1] In 2000 Laycock replaced the original trustee of the trust, Earlyne Murphy.

## 2. *The Hammer Judgment*

In 1992 the Resolution Trust Corporation (RTC) as successor to a failed savings and loan association obtained an in rem judgment from a Kansas trial court against Ellison and his wife totaling $735,000. The judgment grew out of the Ellisons' default on two notes secured by purchase money mortgages on commercial property in Kansas. Eventually, the property that secured the mortgages was sold for $650,000 and Hammer obtained RTC's judgment.

In 2000 Hammer asked the Kansas court to determine Ellison was personally liable on the judgment and the amount of the deficiency owed on the judgment. In 2002 the Kansas court determined Ellison was personally liable. In March 2003 the court calculated the deficiency by adding interest at 15.5 percent per annum, as provided in the initial in rem judgment, to the $735,000 principal for the period from the time of default in 1990 until March 2003 and then deducting the amount recovered from the sale of the security. This resulted in a net judgment of $4,649,575 against Ellison.

Although Ellison appeared in the Kansas proceedings, he did not appeal from the March 2003 order determining his deficiency.

## 3. *Ellison's Estate and Trust Proceedings*

Ellison died on April 23, 2003. Laycock, in addition to her role as trustee of the life insurance trust, is trustee of a family trust[2] Ellison and his wife, who predeceased him, had established and the administrator of Ellison's probate estate. Hammer filed a claim in the probate estate in the amount of his judgment and Laycock, as administrator of the estate, allowed the claim.

As we set forth at the outset, in her role as trustee of the insurance trust Laycock filed a petition for a determination that the insurance trust was exempt from Hammer's claims. In response to the motion, Hammer produced evidence Ellison acted as a cotrustee of the trust, that funds from the trust were distributed to his great-grandchildren, that he communicated about the insurance policy with his insurance agent and the insurance company, and borrowed funds from the policy. Hammer also presented evidence that Laycock used funds from the family trust to repay the amounts Ellison borrowed from the insurance policy because she believed the loans were Ellison's debts. Finally, Hammer presented evidence that the other trust beneficiaries advised Laycock they believed Ellison should be permitted to do as he pleased with money he earned in his lifetime.

---

[2] Hammer has made claims against the assets of the family trust; Laycock has argued the family trust assets are also exempt from Hammer's claims.

In granting the motion for summary judgment, the trial court found that under prevailing authority all the acts Hammer relied upon would not have converted the trust from an irrevocable trust to a revocable trust. The court found that California does not recognize any doctrine of implied revocation of an irrevocable trust and in any event the evidence Hammer presented did not raise any material inference that Ellison had control or ownership of the trust.

Judgment in Laycock's favor was entered and Hammer filed a timely notice of appeal.

## DISCUSSION

### I

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) In this case in seeking a declaration that the trust is exempt from Hammer's claims, Laycock was in reality in the same position as a defendant against whom claims for affirmative relief have been asserted. A defendant satisfies its burden on a motion for summary judgment by showing " 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*) " 'Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Id.* at p. 849.) But "if the showing by the defendant does not support judgment in his favor, the burden does not shift to the plaintiff and the motion must be denied without regard to the plaintiff's showing." (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1534 [80 Cal.Rptr.2d 94].) In determining whether these burdens have been met, we review the record de novo. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1143 [97 Cal.Rptr.2d 707].)

### II

Probate Code section 18200 provides: "If the settlor retains *the power to revoke* the trust in whole or in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor." (Italics added.) Probate Code section 19001, subdivision (a), provides: "Upon the death of a settlor, *the property of the deceased settlor that was subject to the power of revocation* at the time of the settlor's death is subject to the claims of creditors of the deceased settlor's estate and

to the expenses of administration of the estate to the extent that the deceased settlor's estate is inadequate to satisfy those claims and expenses." In light of these provisions there is no serious dispute that in order to reach assets held by the trust Hammer must show that, notwithstanding the terms of the insurance trust, the trust was revocable. (See *DiMaria v. Bank of California* (1965) 237 Cal.App.2d 254, 258–259 [46 Cal.Rptr. 924] [creditor of settlor of trust cannot reach trust assets contrary to terms of irrevocable trust]; *In re Barnes* (2002) 275 B.R. 889, 895–896 [settlor was not owner of assets of irrevocable trust and hence trust assets were not protected by exemptions available to settlor].)

■ The California cases that have considered the issue have looked to the express terms of the trust instrument in determining whether a trust is revocable or irrevocable. (See *Heifetz v. Bank of America* (1957) 147 Cal.App.2d 776, 778 [305 P.2d 979] (*Heifetz*); *Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1206 [116 Cal.Rptr.2d 319] (*Crook*).) In *Heifetz* the settlor of the trust expressly retained the power to revoke a trust. In finding this power implicitly gave the settlor the power to change the beneficiaries of the trust, the court stated: "The nature and extent of the rights retained by the trustor are to [be] measured by the four corners of the instrument." (*Heifetz, supra,* 147 Cal.App.2d at p. 783.) In *Crook* a marital trust became irrevocable upon the death of one of the two spouses who established the trust. Following the death of one of the spouses, the surviving spouse, Florence, nonetheless attempted to name a new beneficiary of the family trust. In finding Florence had no power to make such a change, the trial court stated: "Under California law, the existence or nonexistence of a right to revoke must be determined by examining the trust instrument and determining from language used in the instrument whether [the settlors] intended in 1988 [when the trust was created] to confer on Florence a right to revoke Trust A after [her husband's] death." (*Crook, supra,* 95 Cal.App.4th at p. 1209.)

There are no cases that permit the settlor of a trust to make an irrevocable trust revocable by way of conduct after the trust has been established. Rather, Probate Code section 15403 provides the only means of terminating the irrevocable nature of a trust. Probate Code section 15403 states:

"(a) Except as provided in subdivision (b), if all beneficiaries of an irrevocable trust consent, they may compel modification or termination of the trust upon petition to the court.

"(b) If the continuance of the trust is necessary to carry out a material purpose of the trust, the trust cannot be modified or terminated unless the court, in its discretion, determines that the reason for doing so under the circumstances outweighs the interest in accomplishing a material purpose of the trust. Under this section the court does not have discretion to permit

termination of a trust that is subject to a valid restraint on transfer of the beneficiary's interest as provided in Chapter 2 (commencing with Section 15300)."

The beneficiaries of the insurance trust did not avail themselves of the remedy provided by Probate Code section 15403. In particular, the beneficiaries' statement Ellison should be permitted to do what he wished with the money he earned during his lifetime did not meet the requirements of the statute.

█ Notwithstanding the foregoing, Hammer argues that as a third party creditor of the settlor it should be given the opportunity to attack the trust on broader grounds than have been afforded other claimants to trust property. Hammer contends that as a creditor it should be able to show Ellison treated the trust as his own property and thereby revoked the provisions of the trust. In the absence of the express language of Probate Code sections 18200 and 19001, Hammer's attempt to distinguish third party creditors from other trust claimants might have some currency. However, by expressly giving settlors' creditors the right to reach only the assets of revocable trusts, the Legislature in Probate Code sections 18200 and 19001 has clearly indicated an intention that creditors are to be bound by the terms of an irrevocable trust to the same extent settlors, beneficiaries and other claimants are bound by such an instrument.

In sum, contrary to Hammer's argument, a settlor's conduct after an irrevocable trust has been established will not alter the nature of such a trust. This conclusion is consistent with federal tax cases that, applying a broader incidents of ownership test, have found that breaches of the terms of a trust by a settlor will not make the settlor the owner of trust property for purposes of applying the federal estate tax. As Laycock points out, in *Estate of O'Daniel v. U.S.* (5th Cir. 1993) 6 F.3d 321, 328, *Estate of Louis Richards* (1953) 20 T.C. 904, 915–916, and *Estate of Bloch* (1982) 78 T.C. 850, the federal courts have found that when a settlor has taken funds from an irrevocable trust in violation of the terms of the trust, the settlor's breach of duty will not bring the trust corpus into the estate for purposes of calculating the estate tax. In *Estate of O'Daniel* the settlor had withdrawn the cash surrender value of insurance policies he transferred to a trust. In finding this conduct did not make the trust corpus the settlor's property, the court stated: "O'Daniel arguably breached his fiduciary duty to the trust by drawing down the cash values of the policies [but] he did not exercise incidents of ownership within the meaning of [the Internal Revenue Code]. Incidents of ownership connote the legal power to exercise ownership, not the decedent's practical ability to do so." (*Estate of O'Daniel, supra,* 6 F.3d at p. 328.)

## III

The terms of Ellison's life insurance trust, as well as the terms by which he transferred the policy to the trust, are unambiguous: the trust is irrevocable and the transfer of the policy was similarly irrevocable. Thus the policy proceeds were the property of the trust and not Ellison's estate. (See *Crook, supra*, 95 Cal.App.4th at p. 1209.)

As the trial court noted, however, even if Ellison's conduct following establishment of the trust were relevant with respect to the revocability of the trust, the evidence Hammer produced on the issue did not create an inference Ellison intended to revoke the trust. As the trial court stated in its review of each piece of evidence Hammer relied upon: "The check in Exhibit 2 is just a check paid out to a grandchild, but it is signed by the Trustee, not the Trustor, Mr. Ellison. The check in Exhibit 10 to Mr. Ellison is also signed by the Trustee. Exhibits 3 and 8 do show a communication with the Insurance Company or agent, but that is all. Exhibit 5 shows a communication with the Trustee about the policy, and that is all. Exhibits 14, 15, and 34, 36, 37, and 41 as well as the quoted deposition testimony (see Creditors' Opposition Separate Statement) show that a $25,000 loan from the Insurance . . . Policy was taken, deposited into the Family Trust and then repaid, but again the documents cannot be said to show that Mr. Ellison himself, rather than the Trustee, actually initiated or took any of these actions. And the $25,000 check was made out to the Trust.

"The only documents that perhaps raise an inference of control or owner-ship by the Trustor are Exhibits 6 and 9, which list Mr. Ellison as co-trustee of the insurance policy account. However, even if the Court were to accept as true that the insurance company treated Mr. Ellison as a co-trustee, this in itself would not hel[p] the Creditor's cause because there is no law prohibit-ing trustors from being trustees or co-trustees of an irrevocable trust."

## IV

Finally, Hammer argues because Laycock used funds from the family trust to repay loans to the insurance trust after Hammer obtained its judgment against Ellison, the transfers were fraudulent conveyances within the meaning of Civil Code section 3439.05. Hammer did not raise this contention, which is fact intensive, in the trial court. We decline to do so for the first time on appeal. (See *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1266 [102 Cal.Rptr.2d 813].)

## CONCLUSION

 The record shows the life insurance trust and the transfers to it were irrevocable. Accordingly, the assets of the trust were not available to creditors of Ellison, the settlor.

The judgment is affirmed. Respondent to recover the costs of appeal.

McConnell, P. J., and O'Rourke, J., concurred.