Filed 9/2/25  Zeme v. Wolfe CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SUSAN ZEME, as Trustee, etc.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARC D. WOLFE, as Trustee, etc., et al.,<br><br>        Defendants and Appellants;<br><br>SUSAN WOLFE,<br><br>        Real Party in Interest and Respondent. | A170035, A170457, A170525<br><br>(Marin County<br>Super. Ct. No. PRO2002412) |

In January 2024, the probate court ordered Marc Wolfe and his co-appellants to disburse $1.6 million from Robert (Bob) Wolfe's trust (the trust) to Bob's wife, Susan Wolfe, and to make future disbursements monthly.[1]  It thereafter awarded fees to Susan Zeme — the independent trustee — and Susan Wolfe for securing the disbursements, and it ordered appellants to comply with the fee award to Zeme notwithstanding their appeal.  Appellants challenge the orders.  We remand with instructions to add language to the fee award to Zeme but otherwise affirm.

---

[1] We occasionally refer to Wolfe family members by their first name for clarity, intending no disrespect.  At oral argument, all parties agreed that Bob passed away in April 2025.

# BACKGROUND

Before he married Susan, Bob had two children from a previous marriage, Lisa Wagonfeld and Marc. In 1991, Bob established the trust and named himself the trustee. Marc, Lisa, and Roger Herst — a friend of Bob's — are successor cotrustees (trustees). In addition to his duties as a successor trustee, Marc also manages or comanages most of the entities in which the trust has an ownership interest — including entities that hold the most assets and produce the most income — and he decides (alone or with comanagers) whether entities distribute money to the trust. Lisa manages another trust property (the Ohio property). Susan and Bob were the trust's income beneficiaries.

The trust dictates that after Bob's death, his and Susan's primary residence, his interest in the Ohio property and any income from that interest, and — at a minimum — a $300,000 lump sum be placed in a marital trust for Susan's benefit. It also mandates that if he and Susan sold the family home, "income generated from those proceeds" is payable to Susan for her lifetime. The balance of the trust shall be divided between Marc, Lisa, and their children.

The trust also includes an incapacity clause. It states that, if the trustor "becomes incapacitated for more than a thirty (30) day period, Trustor authorizes the distribution of one-third (1/3) of the net income of all Trust assets to be distributed to Trustor's wife, SUSAN, on a monthly basis for the duration of Trustor's incapacity." The clause also requires an independent trustee for its execution, and it allows the independent trustee to make additional distributions to Susan for her "health, maintenance and support" at the independent trustee's discretion. Any trustee — other than Bob — is

2

"entitled to reasonable compensation" for their services "payable from income or principal as the Trustee may deem proper."

Although the specific date was disputed, the parties agreed Bob became incapacitated no later than June 2020. In February 2022, the probate court appointed Zeme as independent trustee (confirmation order). The court ordered that she be compensated at $250 per hour and authorized her to pay herself professional fees and costs from the trust's assets. To facilitate payment, it ordered the trustees to fund a cash account with $100,000 and to replenish the account to $100,000 whenever it fell below $20,000. Zeme hired counsel and a forensic accountant to assist her. With some effort, she received the trust's 2020 tax returns, some 2021 account statements, and the entities' business ledgers.

In October 2022, Zeme petitioned the probate court to distribute money from the trust to Susan. She explained that, "[b]ased on the terms of the Trust, and the consistent income and business practices of [Bob] Wolfe," "the proper net income of the Trust should be based on the net income earned by the Trust Income Generating Properties." She reasoned that the incapacity provision required her "to distribute 'one-third (1/3) of the net income of *all Trust assets*' " to Susan (italics added) and, historically, Bob "would retain a reasonable reserve of cash in each of the Trust Income Generating Properties and then distribute all additional income to the Trust." But after Bob's incapacitation, "the cash reserves of the Trust Income Generating Properties have increased significantly beyond the historic baselines [Bob] established" rather than being distributed to the trust. Thus — after amending her petition in December — she requested the trustees distribute $1,296,404.51 to her cash account for money potentially owed to Susan for 2020 and 2021. She also requested that the court order the trustees to distribute $50,000 per

month beginning in January 2023, subject to annual true-up payments. The trustees objected, contending the trust had "no net income to distribute."

After a nine-day trial, the probate court concluded that Susan is entitled to receive "1/3" of "the net income of each trust asset." It concluded the trust's language was "unambiguous" and "additional evidence is unnecessary to understand its meaning." It also found the trust's assets are "largely controlled by" the trustees and that "Bob did not want the [trustees] (who have a direct conflict of interest with Susan and control the income distributions to the trust) to participate in (or manipulate)" Susan's payments. Otherwise, "there would have been no reason to appoint an independent trustee for Susan nor would there be a need to use the words 'net income of all trust assets' as opposed to 'net income of the trust.' " It also found "that Marc Wolfe is manipulating the trust assets in a calculated manner to deprive Susan of her distributions." (Fn. omitted.)

In January 2024, Zeme petitioned the probate court to order the trustees to pay her $2,049,124.88 for her attorney and accountant fees. (Unless otherwise indicated, subsequent dates refer to 2024.) She also petitioned the court to modify the confirmation order by requiring the trustees to replenish the cash account with sufficient funds to pay her outstanding professional fees within 15 days of her request.

In March, the probate court granted Zeme's petition (the March order) over the trustees' objection. It ordered the trustees to fund the cash account with $1,990,654.88 (lump sum) for Zeme's outstanding fees. It also ordered Zeme to demand outstanding fees on the first day of each month — beginning in April — and required the trustees to replenish the cash account within 15 days of each demand with sufficient funds to pay her expenses.

4

After the trustees appealed the March order, Zeme petitioned the probate court to order that the trustees comply notwithstanding the appeal under Probate Code section 1310 (all undesignated statutory references are to this code). In May, the court granted the petition. At the hearing, it was concerned with "Zeme's ability to defend the trust first and foremost." It noted she needed funds to address "litigation," "appeals to orders," "to retain . . . [and] pay" "experts," and "to ensure that she can properly, adequately, and reasonably defend the trust in this case." It balanced Zeme's need for fees against the trustees' right to appeal — specifically their right to challenge the reasonableness of the March fee award — and concluded Zeme's need was greater since the trustees had already argued Zeme's requested fees were unreasonable at the probate court. It also noted that, in the March order, it had already found that the "requested fees and amounts were, in fact, reasonable."

The trustees petitioned this court for a writ of supersedeas and appealed the order. We denied the writ. A few days later, the probate court issued an order (1310 order) directing the trustees to comply with the March order notwithstanding their appeal. In particular, the court ordered (1) the trustees to pay the lump sum by June 21; (2) starting in July, Zeme to demand outstanding fees and expenses on the first day of each month; and (3) the trustees to replenish the cash account within 15 days of each demand with sufficient funds to pay Zeme's fees and expenses. In June, the trustees filed a "notice of compliance" with the March order and a "reservation of all appellate rights." (Capitalizations omitted.)

Meanwhile, Susan Wolfe petitioned the probate court for her attorney's fees. Over the trustees' objection, the court granted her $339,258 using its equitable powers.

## DISCUSSION

In appealing the judgment and various orders, the trustees advance a range of arguments.  We address them in turn.

### I.

The trustees contend the probate court erred by misconstruing the trust's incapacity clause.  They argue the trust's language establishes that Bob intended for Susan to only receive distributions based on the trust's income, not income from the entities in which the trust had an ownership interest.  We disagree.

" '[T]he primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor.' " (*Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1206.)  " 'The intention of the transferor as expressed in the [trust] instrument controls the legal effect of the dispositions made in the instrument.' " (*Ibid.*)  " 'The centerpiece of interpretation, of course, is the language contained in . . . the trust document.' " (*Städel Art Museum v. Mulvihill* (2023) 96 Cal.App.5th 283, 293.)  Words " 'are to be taken in their ordinary and grammatical sense, unless a clear intention to the contrary can be ascertained.' " (*Ibid.*)  We interpret the words of an instrument to " 'give every expression some effect, rather than one that will render any of the expressions inoperative.' " (*Ibid.*)  " 'All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole.' " (*Ibid.*)  Where "the interpretation of a trust instrument does not turn on the credibility of extrinsic evidence or require resolution of conflicts in the evidence, it presents a question of law" and "we must independently construe the instrument in question." (*Ibid.*)

The trust plainly requires that Susan receive distributions based on the income of the trust's assets. The incapacity clause states that if the trustor "becomes incapacitated for more than a thirty (30) day period, Trustor authorizes the distribution of one-third (1/3) of the *net income of all Trust assets* to be distributed to Trustor's wife, SUSAN, on a monthly basis and for the duration of Trustor's incapacity." (Italics added.) We give these words their " 'ordinary and grammatical sense' " unless " 'a clear intention to the contrary can be ascertained.' " (*Städel Art Museum v. Mulvihill*, *supra*, 96 Cal.App.5th at p. 293.) The trustees have not identified evidence of a clearly expressed contrary intention. Instead, they focus on the words "income" and "distribution" in isolation. We are unpersuaded. (*Ibid.* [" 'parts of an instrument are to be construed in relation to each other' "].)

The trustees also argue the trust cannot distribute money it does not receive and that the judgment requires they convert principal to cash to meet their obligations to Susan. But in doing so, they ignore the probate court's findings concerning Marc's manipulation of the trust's assets and Bob's efforts to avoid it. The court found Marc "is manipulating the trust assets in a calculated manner to deprive Susan of her distributions." (Fn. omitted.) It also found Bob used the "net income of all Trust assets" language — and required appointment of an independent trustee — precisely to avoid such manipulation. The trustees do not challenge these findings, and together the findings suggest that any cash flow issues are Marc's own doing and that Bob tried to avoid Marc's manipulation by requiring distributions from the trust assets by a trustee other than Marc. We must effectuate the intent of the settlor. (*Crook v. Contreras*, *supra*, 95 Cal.App.4th at p. 1206.)

Moreover — and contrary to the trustees' arguments — the remainder of the trust demonstrates Bob understood the difference between trust

7

income and the income of trust assets. (*Städel Art Museum v. Mulvihill, supra*, 96 Cal.App.5th at p. 293.) He used the two terms to demonstrate different intents. For example, he instructed that at his death his "(90%) interest in the [Ohio property], including ninety percent (90%) of *any and all net income generated from* [*the Ohio*] *property*," be placed in a marital trust for Susan. (Italics added.) He also mandated that if he and Susan chose to sell the family residence, "*income generated from those proceeds*" is payable to Susan for her lifetime. (Italics added.) By contrast, he instructed that Susan — after his death — is entitled to " 'all of the net income of the Marital Trust.' "

The trustees also contend the probate court should have applied the accounting rules set forth in the Uniform Principal and Income Act (UPIA) in construing the incapacity clause.[2] Not so. The UPIA provided rules " 'for identifying income and principal when there is no guidance in the governing instrument.' " (*Manson v. Shepherd* (2010) 188 Cal.App.4th 1244, 1259.) Here, Bob identified what he considered income for purposes of the incapacity clause, i.e., the "income of all *Trust assets*." (Italics added.) Moreover, the UPIA was the "statutory scheme for determining the allocation of money distributed to a trust," it did not provide rules for interpreting trusts. (*Manson*, at p. 1259; *Estate of Thomas* (2004) 124 Cal.App.4th 711, 718 [purpose of UPIA was to "take account of new estate planning practices and financial instruments, as well as to make principal and income rules consistent with the prudent investor rule"].)

---

[2] The Legislature repealed the UPIA and replaced it with the Uniform Fiduciary Income and Principal Act. (Sen. Bill No. 522 (2023–2024 Reg. Sess.), eff. Jan. 1, 2024.) As relevant here, no substantive changes occurred.

In sum, we conclude the probate court correctly interpreted the incapacity clause to refer to the net income of all trust assets, including those of entities in which the trust had an ownership interest.

## II.

The trustees next challenge the March order. They begin by arguing the lump sum fee award is not supported by substantial evidence. Zeme, for her part, argues that section 1310, subdivision (b) renders the appeal of any actions already completed under the 1310 order — including payment of the lump sum — moot. We agree with Zeme that the appeal of the lump sum is moot.

The trustees are not entitled to relief for any error concerning the March order's award of a lump sum, and we need not consider their challenge of it. (*East Bay Regional Park Dist. v. Griffin* (2016) 2 Cal.App.5th 734, 737, 745 (*Griffin*).) Section 1310, subdivision (b) provides that "[a]ll acts of the fiduciary pursuant to the directions of the court made under this subdivision are valid, irrespective of the result of the appeal" and an "appeal of the directions made by the court under this subdivision shall not stay these directions." The trustees, as the trust's fiduciaries and in compliance with the court's 1310 order, paid Zeme the lump sum from the trust's assets. Thus, payment of the lump sum cannot be undone. (*Griffin*, at pp. 737, 745.)

The trustees' contrary arguments fail to persuade. They rely on Code of Civil Procedure section 695.215, but "the Probate Code 'adopts the civil practice rules only where special rules are *not* prescribed.'" (*Goebner v. Superior Court* (2025) 110 Cal.App.5th 1105, 1110.) Here, the Probate Code provides special rules in section 1310. (*Griffin*, *supra*, 2 Cal.App.5th at pp. 737, 745.) The trustees also argue they can avoid section 1310 by claiming they made the payments "voluntarily." But in making this

9

argument, they only provide authorities citing general rules — not the special rules set forth in section 1310.

Next, the trustees argue the probate court abused its discretion by "pre-approving" Zeme's future fees in the March order with no court oversight. Zeme, for her part, argues the March order's provision of fees going forward is an interim order. We agree and construe the future fee provisions of the March and 1310 orders as interim orders. We remand to the court with instructions to add language to both orders confirming that any future fees requested on a monthly basis — starting in April 2024 — are subject to judicial review.

Section 16243 provides that a trustee may pay "reasonable compensation" to "the trustee" and "employees and agents of the trust, and other expenses incurred in the collection, care, administration, and protection of the trust." "Attorneys hired by a trustee to aid in administering the trust are entitled to reasonable fees paid from trust assets." (*Kasperbauer v. Fairfield* (2009) 171 Cal.App.4th 229, 235.) "Probate courts have a special responsibility to ensure that fee awards are reasonable, given their supervisory responsibilities over trusts." (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 269 (*Donahue*).) " ' "[T]he probate court has a duty *imposed by law* to inquire into the prudence of the trustee's administration." ' " (*Ibid.*) " '[A]ttorney fees deriving from probate court litigation are subject to concerns sufficiently unique, we believe, to distinguish them from fees generated in ordinary civil litigation.' " (*Ibid.*) "A trial court may not rubberstamp a request for attorney fees, but must determine the number of hours *reasonably* expended." (*Id.* at p. 271.) A " ' "computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee

10

award." ' " (*Ibid.*)  We review a probate court's decision granting a fee request from a trust's assets for abuse of discretion.  (*Id.* at p. 268.)  " '[D]iscretion must not be exercised whimsically, and reversal is appropriate where there is no reasonable basis for the ruling or the trial court has applied "the wrong test" or standard in reaching its result.' "  (*Id.* at p. 269.)

Plainly, any award of fees not subject to judicial review would be an abuse of discretion.  (*Donahue, supra*, 182 Cal.App.4th at pp. 266–267, 275.)  But we assume the probate court followed applicable law, and we will make all intendments and presumptions to support its order.  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)  Here, we imply the court reserved jurisdiction to review future fee requests for reasonableness.  (*Ibid.*)  At the 1310 hearing, the court stated it was concerned with "Zeme's ability to defend the trust first and foremost."  It wanted to give her the ability to address "litigation," "appeals to orders," "the need to retain . . . [and] pay" "experts," and "to ensure that she can properly, adequately, and reasonably defend the trust in this case."  Moreover, before issuing its order, the court balanced Zeme's need to maintain the litigation against the trustees' right to appeal the reasonableness of her fees, and it concluded Zeme's need outweighed the trustees' right because the trustees were already "given an opportunity" to argue Zeme's requested fees were unreasonable.  Indeed, the court had already concluded "that the [previously] requested fees and amounts were, in fact, reasonable" in the March order.  But the March and 1310 orders were silent about the judicial review of monthly fee requests going forward.  Given the court's reasoning in issuing the 1310 order, we conclude it intended to retain jurisdiction to review future fee requests for reasonableness in both orders.  (*Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1206 ["a court's

11

oral statement may be illustrative of its thinking"].)  So construed, the future fee provisions were not an abuse of discretion.  (*Donahue*, at pp. 269, 271, 275.)

Zeme also contends the March order's future fee directives are unappealable because they merely reaffirm the trustees' obligations under the confirmation order.  The record belies this interpretation.  Rather, Zeme petitioned the probate court to modify the confirmation order.  The court granted her requested modifications and directed the trustees to replenish the cash account at her request, a substantive change from the confirmation order's replenishment process.  The March order is appealable.  (§ 1300, subd. (e) [allowing appeals from orders "[f]ixing, authorizing, allowing, or directing payment of compensation or expenses of an attorney"].)

## III.

The trustees next argue the section 1310 order "cannot stand." (Boldface & capitalizations omitted.)  But the trustees' payment of the lump sum cannot be undone, and the future fee demands are subject to judicial review.  (§ 1310, subds. (a) & (b); *Griffin*, *supra*, 2 Cal.App.5th at pp. 737, 745.)  Thus, we see no reason to consider a challenge to this order.  (*Griffin*, at p. 745.)

## IV.

The trustees next argue the fee award to Susan Wolfe must be reversed.  Specifically, they argue that the probate court relied on *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328 to make the award, and that case requires the trustees' litigation to be frivolous or in bad faith to authorize a fee award.  The trustees misconstrue *Rudnick* and the court's order.  (*Id.* at pp. 1333–1334.)  *Rudnick* awarded attorney fees " 'against the interest in the estate of the party causing the litigation' " for bringing an unfounded suit

12

against the trust. (*Id.* at p. 1334.) That case does not stand for the proposition that the trustees' litigation must be frivolous or in bad faith for a probate court to award fees — as the court did here — from the trust (rather than from the trustees' interest in the trust). (*Id.* at pp. 1333–1334.) The court cited *Rudnick* to show it had the equitable power to do so. (*Id.* at p. 1333.) The trustees' motivation to litigate was irrelevant to the award.

## DISPOSITION

We remand the March and 1310 orders to the probate court with instructions to add the following language to both: "All payments made under this order in response to future fee requests are without prejudice to modification and reallocation by future court order." (*Donahue*, *supra*, 182 Cal.App.4th at pp. 269, 271, 275.) In all other respects, the judgment and orders are affirmed. Susan Wolfe is entitled to her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2) & (4).) The remaining parties shall bear their own costs. (*Id.*, rule 8.278(a)(4) & (5).)

_____

RODRÍGUEZ, J.


WE CONCUR:


_____

TUCHER, P. J.


_____

PETROU, J.


A170035/A170457/A170525; *Zeme v. Wolfe*