Filed 8/18/16

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| EAST BAY REGIONAL PARK DISTRICT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GEOFFREY M. GRIFFIN, as Trustee, etc.,<br><br>     Defendant;<br><br>SIDNEY CORRIE, JR., et al.,<br><br>     Objectors and Appellants. | A141625, A142154<br><br>(Contra Costa County<br>Super. Ct. No. P09-01129) |
| SIDNEY CORRIE, JR., et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>GEOFFREY M. GRIFFIN, as Trustee, etc.,<br><br>     Defendant;<br><br>EAST BAY REGIONAL PARK DISTRICT,<br><br>     Objector and Respondent. | A143688 |

These consolidated appeals arise out of a dispute concerning the trust of Armand Borel. The trust states that, upon Borel's death, a parcel of the trust's real property is to be distributed to the East Bay Regional Park District (the District) for the purposes of

---

     * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

establishing an agricultural park. A portion of that same property is also the subject of an option agreement between Borel and Sidney J. Corrie.

After Borel's death, Corrie filed a petition for an order instructing the trustee to convey a portion of the property to him pursuant to the option agreement. The District opposed that petition, and also filed a competing petition pursuant to Probate Code[1] section 17200. The District's section 17200 petition sought an order authorizing the trustee to distribute the property to the District and to receive an $800,000 loan on behalf of the trust. The probate court granted the District's petition, and Corrie appealed.[2] The District subsequently petitioned the probate court pursuant to section 1310, subdivision (b) to authorize the immediate distribution of the land and acceptance of the loan notwithstanding the pending appeal. The order granting that motion is also on appeal. While the first two appeals were pending, the probate court held a trial on the validity of Corrie's option rights and issued a statement of decision finding Corrie's option was unenforceable. Judgment was entered in favor of the District, and a third and final appeal followed.

We find appellants are not entitled to relief in connection with their first two appeals, because under section 1310, subdivision (b), the actions taken by the trustee are valid, regardless of the outcome on appeal. Accordingly, those appeals are dismissed. As to the third appeal, we affirm, as we agree with the probate court that the option agreement is void and unenforceable.

## I. BACKGROUND

### A. *The Trust*

Armand Borel was the settlor and trustee of the Armand Borel Trust dated June 20, 1994. The trust's estate consists of various real and personal property, including a 16.65-acre parcel of real property located in Danville (the Danville property).

---

[1] All statutory references are to the Probate Code unless otherwise specified.

[2] Lynette Arbios Cleland and Peter Arbios, Borel's heirs, also opposed the District's petition and joined in Corrie's appeal. We refer to Corrie, Cleland, and Arbios collectively as appellants.

2

Borel executed a revised trust instrument on July 14, 2008 (the Trust). During his lifetime, Borel was to act as the trustee and could distribute proceeds from the Trust to himself. On Borel's death, the Trust was to become irrevocable, Noelle Flanagan was to be appointed as the successor trustee, and various distributions were to be made. Specifically, the successor trustee was to distribute $300,000 to Dana Vasquez, give all of Borel's firearms and ammunition to Carl J. Mast, and pay the estate's death taxes, debts, and expenses.

As to the remaining trust estate, the successor trustee was to distribute the Danville property to the District "for so long as it [is] used as and for an agricultural park." The distribution of the Danville property was further conditioned on the District doing or performing all of the following: "all structures of whatever kind or nature are to remain on the property, and be maintained, and if necessary, restored"; various equipment, including several vintage automobiles, shall be "held, maintained, and exhibited as the beneficiary may desire"; Borel's residence shall be restored and "used as a museum and meeting facility"; and various personal property within the residence shall be restored, including various antique furniture, four deer heads, two ducks, an albino blackbird, and a restored gas pump.

The Trust also states: "If in the trustee[']s sole opinion, which shall be final and incontestable, the [District] cannot meet each and every of the above-described conditions then" the Danville property shall instead be distributed to the City of San Ramon, first, or to the Town of Danville, second, subject to the same terms and conditions. If none of these beneficiaries take the Danville property, the trustee may lease any or all of the property to them under such terms and conditions the trustee deems appropriate. If the remaining trust property is not completely disposed of by the preceding provisions, it shall be distributed to Borel's heirs.

The Trust also includes a no contest clause, which provides in relevant part: "If any beneficiary under this instrument . . . directly or indirectly contests this instrument, any amendment to this instrument, . . . or the validity of any contract, agreement . . . , declaration of trust, beneficiary designation, or other document executed by the settlor or

3

executed by another for the benefit of the settlor that is part of the settlor's integrated estate plan . . . then the right of that person to take any interest given to him or her by this instrument . . . shall be void, and any gift or other interest in the trust property to which the beneficiary would otherwise have been entitled shall pass as if he or she had predeceased the settlor without issue."

## B. *The Option Agreement*

On June 14, 2004, Borel and Corrie entered into a "Real Property Option and Purchase Agreement" (the Option Agreement) pertaining to the Danville property. The Option Agreement granted Corrie a five-year exclusive and irrevocable option to purchase up to seven acres of the Danville property at a price of $500,000 per acre. In return for the purchase option, Corrie was required to pay Borel a nonrefundable option fee of $100,000 up front, plus another $5,000 per month during the option period. The Option Agreement also gave Corrie a right of first refusal to purchase "the balance of the [Danville property] that is not part of this Option Agreement."

On March 25, 2009, Borel and Corrie amended the Option Agreement to (1) extend the option period by one year to June 14, 2010; (2) increase the option fees from $5,000 per month to $10,000 per month; and (3) give Corrie the option to extend the option period to June 14, 2011, by payment of an additional $100,000 to Borel, which would count toward the purchase price of the property if Corrie exercised the option (Amendment No. 1). Corrie timely made the $100,000 payment required for extension of the option period until June 14, 2011.

Borel died on April 19, 2009, and Flanagan became the successor trustee of the Trust. On November 16, 2010, Flanagan and Corrie executed a document captioned "Amendment #2 to Real Property Option and Purchase Agreement" (Amendment No. 2). Amendment No. 2 extended the option period to June 14, 2013, in return for Corrie making "advance principal payments" totaling $500,000 over the succeeding five months, as well as continuing to pay monthly option fees, not applicable to the purchase price, at the higher rate of $14,286 per month, instead of $10,000 per month, until the option was exercised. Amendment No. 2 also gave Corrie an option to purchase "an

4

additional adjacent three acres" at $500,000 per acre, "thus bringing the total property subject to an option to purchase to ten acres." Further, Amendment No. 2 stated the parties acknowledged their obligations were conditioned upon the approval and filing of a final subdivision map or parcel map.

## C. *District's Petition to Remove Trustee*

In April 2011, Vasquez and the District filed separate petitions to remove Flanagan as the successor trustee. The court subsequently ordered Flanagan to produce various financial records. According to the District, these records showed Flanagan used significant Trust funds for improper purposes. Among other things, the District asserted Flanagan attempted to frustrate Borel's plan for creating an agricultural park on the Danville property and entered into Amendment No. 2 to the Option Agreement to obtain funds for her own personal use.

In connection with the petition, the District filed with the probate court a "Preliminary Concept Plan," dated October 24, 2011, which detailed how the District planned to establish an agricultural park on the Danville property in conformance with the terms and conditions of the Trust. The concept plan states that, given the bequests, liens, and encumbrances on the estate property, it is likely up to 10 acres of the Danville property would be sold, generating up to $5 million, of which about $3 million would be used to establish the agricultural park.

On December 8, 2011, before the petition could be adjudicated, Flanagan died. Elizabeth Soloway was appointed as the second successor trustee. Soloway later filed her accounting and report of Trust administration with the court, indicating Flanagan used Trust funds to pay herself $232,219.64. Soloway's accounting also identified an additional $163,633.77 in "miscellaneous expenses" that were not Trust expenses.

## D. *Corrie's Motion to Instruct and Prior Appeal*

On November 22, 2011, Corrie filed a motion for an order instructing the trustee to convey to him the seven acres of the Danville property subject to the Option Agreement. The motion was made on the ground Corrie had contracted to sell his option

rights to a third party and that buyer's due diligence inspection of the property and determination to close must take place prior to December 31, 2011.

Soloway filed an objection to Corrie's petition and requested a separate trial on the issue of whether the Option Agreement was void for failing to condition sale of the property on compliance with the Subdivision Map Act (Gov. Code, § 66410 et seq.). The probate court decided to proceed on that basis and set a trial on "the bifurcated issue of the defense of illegality." Following briefing and argument, the probate court ruled the Option Agreement was void and unenforceable at its inception due to noncompliance with the Subdivision Map Act, and subsequent acts by the parties were ineffective to revive its validity.

Corrie appealed and we reversed and remanded in an opinion dated May 16, 2013. We concluded Amendment No. 2 cured the illegality of the original option agreement. (*Corrie v. Soloway* (2013) 216 Cal.App.4th 436, 449.) The District and Soloway had argued Amendment No. 2 constituted a breach of trust that would deprive the District of its bequest. (*Id.* at pp. 445–446.) We rejected the argument based on a lack evidence in the record, stating our decision was "[w]ithout prejudice to the District's position in any further proceedings on this point." (*Id.* at p. 446.)

E. *District's Section 17200 Petition*

The subject of the first appeal now before us is the District's petition for the probate court to instruct the trustee, pursuant to section 17200. The original petition was filed on September 10, 2013, and a new petition was filed on December 3, 2013. Among other things, the new petition sought an order instructing and authorizing the trustee to receive a loan of up to $800,000 from the District.

The District alleged an order authorizing the loan was necessary because the Trust was nearly insolvent due to Flanagan's malfeasance. According to the District, the Trust lacked sufficient funds to service its debts, pay its estate and property taxes, and cover its operational costs. The District had previously loaned the Trust $700,000 in July 2012, and $99,958.90 in July 2013 for various expenses. The July 2012 loan was secured by a third deed of trust against the Danville property, while the July 2013 loan was unsecured.

6

The District, in October 2013, also purchased a $1.4 million loan to the Trust from Savvy Real Estate Capital (the Savvy loan). The Savvy loan was secured by the Danville property and had gone into default.

In addition to demanding an order authorizing the loan, the District sought to modify the Trust pursuant to the doctrine of *cy près*. Specifically, the District stated it wished to receive the Danville property "without conditions to utilize the entire [parcel]," explaining "the park as described in the Trust is no longer feasible given the changed circumstances during the Trust administration." Further, the District requested an order instructing the Trustee to distribute an unrestricted and unconditional grant deed to the Danville property. The District represented such a grant deed was necessary for the Trust to take a charitable deduction on its estate tax return.

The Attorney General, who is tasked with regulating charitable trusts, filed a response to the District's section 17200 petition, stating the petition did not appear to establish the need to modify the Trust through *cy près*. The Attorney General asserted that, although the petition did not track the specific conditions contained in the Trust, it did indicate an intention to establish an agricultural park. The Attorney General concluded that if the court was inclined to grant the petition, the specific restrictions in the Trust regarding the use of the property should be included in the court's order.

On April 17, 2014, after a contested hearing on the matter, the probate court issued an order granting the petition (the section 17200 order). The court found it need not decide the applicability of the *cy près* doctrine, as the stated intent of the District did not depart from Borel's wishes. The trustee was instructed to receive an $800,000 loan from the District, $300,000 of which was to be held in trust for the bequest to Vasquez. The court also instructed the trustee to distribute the Danville property to the District by unrestricted and unconditional grant deed. Appellants timely appealed the section 17200 order.

## F. *District's Section 1310, Subdivision (b) Petition*

The appeal of the section 17200 order stayed the order's enforcement. The District filed a petition pursuant to section 1310, subdivision (b) to lift the stay.

7

Section 1310, subdivision (b) allows a probate court to "direct the exercise of the powers of the fiduciary" for the purpose of "preventing injury or loss to a person or property" while an appeal is pending. The District requested the court direct the trustee to perform the acts previously ordered in the section 17200 order. Absent such an order, the District argued, there was a risk the Trust would default on its existing secured loans and place the Danville property in imminent risk of foreclosure.

On May 20, 2014, after considering the evidence and holding a contested hearing, the probate court issued an order granting the motion (the section 1310(b) order). The court found the Trust was insolvent; due to the insolvency, the beneficiaries and claimants of the trust would suffer harm unless additional revenue was obtained; and the only source currently proposed for such revenue was from the District. The court also found appellants were subject to no risk of harm if the loan was authorized, as the District's ownership interest in the Danville property was subject to Corrie's option rights, to the extent they were enforceable. On the other hand, appellants, Trust beneficiaries and claimants, and the District would be subject to imminent risk of harm if the proposed loan was not authorized. The court found that, without the loan: the Trust could not maintain insurance on the property; the property could not be safely maintained; an IRS tax lien of over $3.5 million would continue to accrue interest and penalties; there was a risk of foreclosure due to past due loan balances; and the Trust would be unable to take advantage of a negotiated reduction in legal fees that was contingent upon timely payment.

Appellants timely appealed the section 1310(b) order.

## G. *Trial on Validity of Corrie's Option Rights*

The final appeal in this matter arises out of the trial on the validity of Corrie's option rights, which commenced on June 4, 2014. In their pretrial briefing, appellants asserted the trial should be vacated because "there [wa]s no matter pending with respect to the June 4 trial date." The probate court rejected appellants' arguments in a June 4, 2014 order. The court explained there were at least two petitions that may serve as the basis for the pending trial: (1) Corrie's November 22, 2011 petition for instructions,

8

which was the subject of our prior opinion in *Corrie v. Soloway, supra,* 216 Cal.App.4th 436; and (2) Corrie's "Petition for Instructions to Trustee re Right of First Refusal, filed on January 30, 2014." The probate court also rejected Corrie's claim that the first petition became moot, and found Corrie's attempt to withdraw the petition was precluded by Code of Civil Procedure section 581.

The trial proceeded as scheduled. On September 23, 2014, after an 11-day trial, the probate court issued a detailed, 37-page statement of decision. The court once again rejected appellants' jurisdictional arguments, as well as their argument the District lacked standing to object to the Option Agreement. The court also rejected appellants' contention the District had violated the Trust's no contest clause, finding the clause did not encompass the Option Agreement, and in any event, the agreement did not constitute a protected instrument within the meaning of the Probate Code.

Turning to the substance of the dispute, the probate court found the original Option Agreement and Amendment No. 1 had expired, and Amendment No. 2 was void and unenforceable since Flanagan acted without authority in entering into it. The court explained: "[O]ne of Borel's clear purposes . . . was to create an agricultural park, after certain specified distributions of personal property were made. By purporting to convey rights in the [Danville property] to Corrie in Amendment #2 on November 16, 2010, more than [1.5] years after Borel's death, Flanagan acted in excess of her express authority. She did so in a manner inconsistent with the purpose of the trust and in violation of her fiduciary duties owed to the beneficiaries." The court also found that, "in disregard of the interests of the beneficiaries, Corrie and Flanagan negotiated Amendment #2 for their own personal purposes and gain." (Fn. omitted.)

The court entered judgment in favor of the trustee and the District and against appellants on October 17, 2014, and appellants timely appealed.

## II. DISCUSSION

### A. *Section 17200 Order and Section 1310(b) Order*

The probate court's section 17200 order directed the trustee to distribute the Danville property to the District via unconditional grant deed. It also directed the trustee

9

to receive an $800,000 loan from the District, which was to be secured by a deed of trust. This order was stayed by appellants' appeal, but that stay was effectively lifted when the court issued the section 1310(b) order, and once again authorized the trustee to accept the loan and deed the property. Because actions taken by the trustee pursuant to section 1310, subdivision (b) are valid, irrespective of the outcome of an appeal, there is no relief we can provide appellants in connection with their appeals of both the section 1310(b) order and the section 17200 order.

"Probate Code section 1310, subdivision (a), provides that, subject to listed exceptions, an appeal stays the operation of an order." (*Conservatorship of McElroy* (2002) 104 Cal.App.4th 536, 555.) Section 1310, subdivision (b) provides for an exception to the automatic appellate stay, permitting the probate court's discretionary retention of jurisdiction in limited circumstances, notwithstanding the pendency of an appeal: "Notwithstanding that an appeal is taken from the judgment or order, for the purpose of preventing injury or loss to a person or property, the trial court may direct the exercise of the powers of the fiduciary, or may appoint a temporary guardian or conservator of the person or estate, or both, or special administrator or temporary trustee, to exercise the powers, from time to time, as if no appeal were pending. *All acts of the fiduciary pursuant to the directions of the court made under this subdivision are valid, irrespective of the result of the appeal.* An appeal of the directions made by the court under this subdivision shall not stay these directions." (§ 1310, subd. (b), italics added.)

The last sentence of section 1310, subdivision (b) appears to contemplate appeals from orders made pursuant to the statute. However, the second to last sentence—which states the acts of the fiduciary taken pursuant to section 1310, subdivision (b) are valid, regardless of the outcome of appeal—indicates the relief that may be sought through such appeals is limited. Thus, an appellate court may not reverse an order made pursuant to section 1310, subdivision (b) to the extent doing so would disturb acts of the trustee taken pursuant to statute. Moreover, where a section 1310, subdivision (b) order grants relief identical to that of the underlying order on appeal, the statute effectively deprives an appellant of his or her right to appeal altogether.

10

We recognize depriving a litigant of his or her right to appeal is an extraordinary measure. But the Legislature appears to have determined that, in certain cases, expeditious resolution of disputes is more important than allowing for a right of review.[3] Our Supreme Court reached the same conclusion in *Gold v. Superior Court* (1970) 3 Cal.3d 275, 281 (*Gold*), in which it considered a statute virtually identical to section 1310, subdivision (b) that applied to guardianship and conservatorship proceedings. That statute stated the trial court had jurisdiction to direct the exercise of the powers of the conservator notwithstanding a pending appeal, but only for the purpose of preventing injury or loss to person or property. (*Gold,* at p. 281.) Like section 1310, subdivision (b), the statute also stated the acts of the conservator shall be valid, irrespective of the results of an appeal. (*Gold,* at p. 281.) The court held the statutory exception to the stay should be narrowly construed: "By specifically conditioning the application of the statute upon the prevention of injury or loss to person or property the Legislature has determined that the exception should be operative only in a limited class of cases. . . . [T]he language of this statute strongly suggests that the exception applies only to the exceptional case involving a risk of imminent injury or loss." (*Ibid.*)

The Supreme Court explained such a construction was necessary because orders issued pursuant to the statute may not be subject to appellate review: "Where . . . the trial court's order directs the very acts which constitutes the subject matter of the appeal, *the exception operates to effectively deprive the appellant of his appeal*. By validating the conservator's acts 'irrespective of the result of the appeal' and notwithstanding the fact that the appellant ultimately prevails, the Legislature has created an extraordinary procedure. In essence, the Legislature appears to have determined that in some cases the need for speedy disposition of certain matters outweighs the interest in affording the affected parties a right of review." (*Gold*, *supra*, 3 Cal.3d at p. 282, italics added; see *Kane v. Superior Court* (1995) 37 Cal.App.4th 1577, 1584–1586 [citing *Gold* and adopting the same interpretation of a substantially similar statute].)

_____

[3] The legislative history of section 1310 appears to be silent on this issue.

11

More recently, the Second Appellate District addressed the appealability of section 1310, subdivision (b) orders in *Sterling v. Sterling* (2015) 242 Cal.App.4th 185. That case involved a dispute between Rochelle and Donald Sterling, the settlors and cotrustees of a trust which owned the Los Angeles Clippers basketball team. (*Id.* at p. 188.) After Donald made several racist remarks and the National Basketball Association sought to terminate the Sterling's ownership of the Clippers, Rochelle filed a section 1310, subdivision (b) petition seeking a court order to confirm the sale of the team for $2 billion. (*Sterling*, at pp. 190, 192.) The probate court granted the petition over Donald's objections. (*Id.* at pp. 192–193.) On appeal, Donald requested the court reverse the probate court's orders and direct the sale of the Clippers be undone. (*Id.* at p. 195.) The court held Donald failed to show he was entitled to such relief since acts taken pursuant to section 1310, subdivision (b) are valid regardless of the outcome on appeal. (*Sterling*, at p. 195.) The court concluded: "[E]ven if Donald is successful, the sale of the Clippers cannot be 'undone' and Donald seeks no other relief and demonstrates no other prejudice." (*Ibid.*) The court found this issue was dispositive, but nevertheless went on to discuss Donald's other arguments, including his contention there was no imminent risk of injury or loss that justified authorizing the sale under section 1310, subdivision (b). (*Sterling*, at pp. 195, 198–200.)

Likewise, in the instant action, appellants are essentially arguing we should reverse the probate court's section 1310(b) order and undo the District's $800,000 loan to the Trust, as well as the grant deed of the Danville property to the District. This we cannot do. The trustee accepted the loan and deeded the property pursuant to the section 1310(b) order, and thus the trustee's acts are valid irrespective of the outcome on appeal. And even if the probate court erred, there is no relief we can provide to appellants in connection with their appeal of the section 1310(b) order. Nor is there any relief we can provide appellants in connection with their appeal of the section 17200 order, as that order granted identical relief. Put another way, we cannot reverse the section 17200 order without also invalidating the acts of the trustee taken pursuant to section 1310, subdivision (b), which would be a direct violation of the statute. As this

12

issue is dispositive, we need not and do not consider appellants' contentions that the section 1310(b) order was unwarranted because there was not an extraordinary risk of harm or loss. We also need not and do not consider appellants' contentions that the section 17200 order is inconsistent with the terms of the Trust and the probate court could not modify the Trust's terms through the doctrine of *cy près*.

In response to our request for supplemental briefing, appellants conceded the actions taken by the trustee pursuant to the section 1310(b) order remain valid notwithstanding the outcome of the appeal. They also appear to concede the trustee's actions in accepting the $800,000 loan cannot be undone, stating they no longer seek to " 'roll back' " the loan. Notwithstanding these concessions, appellants maintain the $800,000 loan authorized by the probate court is too large. They assert $300,000 of the loan that was to be held in trust for beneficiary Vasquez should be returned immediately because Vasquez is now deceased. However, as appellants concede, Vasquez's death is not reflected in the record. Accordingly, we cannot base our decision on that fact. Appellants appear to contend an additional portion of the loan should also be paid back immediately because it is unnecessary to avoid imminent harm. But it is entirely unclear from the record how much of the loan the Trust has already spent, and the Trust cannot pay down the loan with money it does not have.

Appellants assert there are other significant problems with the probate court's section 1310(b) and section 17200 orders which can be addressed on appeal without invalidating the trustee's actions. Specifically, they assert we should address the aspects of the court's orders authorizing the trustee to distribute the Danville property to the District via unconditional grant deed. Their arguments on this point are not the model of clarity. They assert that while section 1310, subdivision (b) validates the trustee's actions, the statute does not "have any impact on the actions of a non-trustee [(the District)]." They further contend the District's section 17200 and 1310, subdivision (b) petitions amounted to an attack on the Trust and an attempt to frustrate the intent of Borel, thereby triggering the Trust's no contest provisions, and resulting in the District's forfeiture of its gift under the Trust.

13

Setting aside that the District's actions did not trigger the no contest clause (see section II.B.2., *post*), appellants' arguments are unavailing. At bottom, appellants are essentially asserting it was improper for the trustee to convey the Danville property to the District, and the property should be returned to the Trust. Even if they are correct that the probate court erred, pursuant to section 1310, subdivision (b), we cannot now invalidate the actions of the trustee or otherwise undo the transaction. Appellants attempt to get around section 1310, subdivision (b) by shifting the focus from the actions of the trustee to those of the District, asserting the District's actions ran afoul of the no contest clause. But regardless of whether the District violated the no contest clause, we cannot reverse the probate court's orders without also invalidating the trustee's actions in transferring the property. Since a reversal cannot be squared with section 1310, subdivision (b), the appeals of the section 1310(b) and section 17200 orders necessarily fail.[4]

In sum, we find there is no relief we can grant appellants in connection with their appeals from the section 17200 order and the section 1310(b) order. Accordingly, those appeals are dismissed.

## B. *Corrie's Option*

Appellants also appeal from the judgment entered on October 17, 2014. In the statement of decision underlying the judgment, the probate court found that Flanagan, as successor trustee, lacked the power to enter into Amendment No. 2 to the Option Agreement on behalf of the Trust. To the extent Flanagan had the power to agree to Amendment No. 2, the court also found the parties had failed to adequately identify the property subject to the option, Corrie materially breached the agreement by failing to make the required option payments, Corrie failed to properly exercise the option, and the transfer of the property to the District did not trigger Corrie's right of first refusal.

---

[4] Though we need not reach the issue, we question appellants' assertion the District could not take the Danville property because it had no intention of creating the agricultural park envisioned by Borel. Contrary to appellants' contentions, the Trust appears to express a general charitable intent. And since Flanagan's actions as successor trustee rendered the Trust insolvent, a modification of the Trust's terms was warranted to carry out Borel's intent.

14

Appellants now argue (1) the probate court lacked jurisdiction to enter the statement of decision and the resulting judgment, (2) the District violated the Trust's no contest clause, (3) the District lacked standing to contest Corrie's option rights, and (4) the Trust authorized Flanagan to enter into Amendment No. 2. We find these arguments unavailing.[5]

### 1. The Probate Court Had Jurisdiction

Appellants argue the probate court lacked jurisdiction to proceed with a trial on the validity of Corrie's option rights, and thus also lacked jurisdiction to issue a statement of decision and judgment on the issue. The probate court addressed and rejected most of these arguments below. We agree with the probate court's conclusion.

In pretrial briefing submitted shortly before the June 2014 trial date, Corrie argued the court lacked jurisdiction to proceed because the issue of whether his option was valid was moot. Corrie reasoned that, in his November 22, 2011 petition to instruct the trustee to convey the property to him, he had emphasized time was of the essence because he had a buyer ready to purchase the land. Corrie asserted the buyer had since withdrawn its offer. Corrie also stated: "Should there be any doubt on the issue, by this pleading, Mr. Corrie withdraws the Petition for Instructions filed on [*sic*] November 2011."

The timing of Corrie's mootness claim is suspect. He filed his first petition for instructions on November 22, 2011, and claimed he needed to close the deal with his buyer on or before January 15, 2012. The initial trial date for the petition was set for March 2012, and the appeal of the initial order denying the petition was not resolved until May 2013, 16 months after the purported closing date. Yet Corrie did not raise the issue that his buyer was withdrawing until May 2014, on the eve of the second trial on the validity of the option. Given that Corrie vigorously litigated his November 22, 2011 petition for over three years after the closing date with the buyer, his contention the

---

[5] Appellants also take issue with the probate court's other findings regarding the identification of the property subject to the option agreement, the parties' performance on the contract, and Corrie's right of first refusal. As we find Flanagan lacked the power to enter into Amendment No. 2, we need not and do not reach these issues.

petition was filed solely for a "specific sale" to that buyer strains credulity. Moreover, even if Corrie did not have an immediate interest in adjudicating the validity of his option rights, the District did. By the time of the trial, the Danville property had already been conveyed to the District via unconditional grant deed pursuant to the probate court's section 1310(b) order.

It is also questionable whether Corrie could voluntarily dismiss his November 22, 2011 petition without leave of the court. As the probate court held, a plaintiff may only dismiss an action without leave "before the actual commencement of trial." (Code Civ. Proc., § 581, subd. (b)(1).) Here, the probate court found the trial in this matter commenced in March 2012, when it held a hearing to determine the legality of the Option Agreement. We reversed the probate court's order on illegality and remanded for further proceedings, which ultimately culminated in the June 2014 trial. The probate court held the June 2014 trial was merely a continuation of the March 2012 hearing. There is some support for the probate court's holding in the case law. "The legal principles that have evolved in this area tend to focus on the reasons for the dismissal and whether the plaintiff acted in good faith or merely for tactical reasons." (*Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544.) Thus, courts have held: "Once the parties commence putting forth the facts of their case before some sort of fact finder, such as an arbitrator, or at the pretrial stage a ruling is made on an issue of law or on admitted facts which effectively disposes of the plaintiff's case against him, it is unfair—and perhaps a mockery of the system—to allow the plaintiff to dismiss his complaint and refile." (*Gray v. Superior Court* (1997) 52 Cal.App.4th 165, 173.) In this case, given the competing claims to the Danville property, the validity of Corrie's option rights needed to be resolved at one point. The issue did not disappear merely because Corrie sought to voluntarily dismiss his petition without prejudice.

Even if trial had not yet commenced, Corrie was estopped from withdrawing his petition. On May 8, 2014, the parties stipulated the trial would proceed as planned notwithstanding the appeal of the probate court's order granting the District's section 17200 petition. Appellants now argue the May 8 stipulation was mooted by the

16

probate court's section 1310(b) order. Not so. The validity of Corrie's option remained a live issue. While the section 1310(b) order conveyed the entirety of the Danville property to the District, it also stated the District's interest in the property was subject to Corrie's option rights, to the extent they were enforceable.

The probate court found another basis for holding the June 2014 trial was to adjudicate Corrie's second petition for instructions, which was filed January 30, 2014. In that petition, Corrie asserted he had a right of first refusal to the subject property pursuant to his Option Agreement. Like Corrie's first petition for instructions, the January 30, 2014 petition raised the issue of the validity of the Option Agreement. Corrie now argues the January 30, 2014 petition could not have been adjudicated at the June 2014 trial because it was filed after the court set the June trial date at a hearing held on January 15, 2014. But on February 10, 2014, the probate court issued another order stating both Corrie's November 22, 2011 petition and his January 30, 2014 petition would be adjudicated at the June trial.[6] Thus, regardless of the original plan for the trial, the court ultimately made it clear both petitions would be tried together. As Corrie attempted to withdraw only one of his pending petitions, there was no reason to vacate the trial.

## 2. No Contest Clause Does Not Apply

The Trust's no contest clause provides beneficiaries forfeit their right to take if they directly or indirectly contest the Trust or any other part of Borel's integrated estate plan. Appellants contend the District mounted a direct contest and thus violated the no contest clause by (1) seeking an unrestricted deed to the Danville property with no requirement of creating the agricultural park as envisioned by Borel, and (2) by seeking to invalidate Corrie's option agreement. In the alternative, appellants argue the District's actions amounted to an indirect contest. While a no contest clause may no longer be enforced against indirect contests under the current statutory scheme, appellants argue we

---

[6] In its statement of decision, the probate court stated the hearing on the January 30, 2014 petition was originally set for March 6, 2014, but was later continued to be heard at the trial scheduled to commence in June 2014. Either way, the probate court intended to try Corrie's petitions together.

should apply the former scheme, which did recognize indirect challenges, pursuant to the so-called "fairness exception." We find appellants' arguments on both points unavailing.

**a. *District Did Not Bring a Direct Contest Under Current Law***

Under the current statutory scheme, a no contest clause may only be enforced against the following types of contests: (1) "[a] direct contest that is brought without probable cause"; (2) "[a] pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer"; and (3) "[t]he filing of a creditor's claim or prosecution of an action based on it." (§ 21311, subd. (a).) The second and third categories clearly do not apply here. Accordingly, the pertinent question is whether the District brought a direct contest without probable cause. We conclude it did not.

As an initial matter, the District did not bring a direct contest. The Probate Code defines that term as a contest alleging the invalidity of a protected instrument based on one or more of the following grounds: forgery; lack of due execution; lack of capacity, menace, duress, fraud, or undue influence; revocation of the will, trust, or instrument; or disqualification of a beneficiary. (§ 21310, subd. (b).) The District's section 17200 petition alleged nothing of the sort. It merely sought an order directing the trustee to accept a loan and convey the Danville property to the District. It also requested modification of certain requirements concerning the creation of the agricultural park due to changed circumstances. The District's section 1310, subdivision (b) petition essentially sought identical relief.

Appellants assert the District mounted a direct contest to section 6.8 of the Trust, which sets forth the general powers of the trustee, by arguing Flanagan, as successor trustee, lacked the power to enter into Amendment No. 2 to the Option Agreement. The argument is meritless. Appellants cite to nothing in the record suggesting the District tried to invalidate section 6.8. In any event, there is an obvious and significant distinction between arguing section 6.8 is invalid and arguing that section 6.8 did not authorize Flanagan to agree to Amendment No. 2 on behalf of the Trust. Under appellants' logic,

18

the no contest clause also bars Cleland and Arbios from taking anything as they are challenging the Trustee's authority to distribute the Danville property to the District.

Appellants also assert the District mounted a direct challenge by trying to invalidate the Option Agreement and its amendments. We disagree. Direct contests are limited to challenges of "protected instruments." (§ 21310, subd. (b).) A protected instrument is an "instrument that contains the no contest clause" or an "instrument that is in existence on the date that the instrument containing the no contest clause is executed and is expressly identified in the no contest clause, either individually or as part of an identifiable class of instruments, as being governed by the no contest clause." (§ 21310, subd. (e)(1)–(2). The Option Agreement and its amendments do not contain no contest clauses, nor are they expressly mentioned in the Trust. Indeed, Amendment No. 1 to the Option Agreement was signed after Trust was executed, and Amendment No. 2 was signed after Borel's death.

Nevertheless, appellants argue the Option Agreement is a "critical part" of Borel's integrated estate plan, and thus any attempt to invalidate constitutes a direct contest. In support they rely on *Genger v. Delsol* (1997) 56 Cal.App.4th 1410 (*Genger*) and *Burch v. George* (1994) 7 Cal.4th 246 (*Burch*). Both cases were decided before the Legislature amended the Probate Code to greatly restrict the reach of no contest clauses. (*Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, 1069.) Moreover, a legislative report drafted in connection with the 2001 amendments to the Probate Code cited *Genger* and *Burch* as cases in which no contest clauses had been applied overbroadly and inconsistently by the courts. (*Bradley v. Gilbert*, at pp. 1069–1070.)

To the extent *Genger* and *Burch* remain good law, they are distinguishable. In *Genger*, the court held a challenge to a stock redemption agreement should be treated as contest of the trust since the agreement was the cornerstone of the decedent's integrated estate plan. (*Genger, supra*, 56 Cal.App.4th at pp. 1421–1422.) Unlike here, the trust expressly referenced the stock redemption agreement. (*Id.* at p. 1417.) *In Burch*, a surviving spouse brought a petition to determine whether she could, without violating a no contest clause, litigate her rights to certain assets in her deceased husband's trust

19

estate under the community property laws and ERISA.[7] (*Burch, supra*, 7 Cal.4th at p. 251.) The court held the proposed litigation would violate the no contest clause. (*Ibid.*) If successful, the proposed litigation would have thwarted the trust provision providing for the allocation of all assets placed in the trust estate to subsidiary trusts, and result in the nullification of the husband's intent that the wife be put to an election of her independent rights to all property transferred to the trust. (*Id.* at p. 261.) In contrast, in the instant action, the Trust does not provide for the distribution of any assets to Corrie. To the contrary, the Trust provides the real property subject to Corrie's Option Agreement is to be distributed to the District.

Even if the District's challenge to Corrie's rights under the Option Agreement amounted to a direct contest (it does not), it was brought with probable cause. "[P]robable cause exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) Such is the case here. In Corrie's prior appeal, we found he never exercised his rights under the original Option Agreement or the first amendment to it. (*Corrie v. Soloway*, *supra*, 216 Cal.App.4th at p. 450.) Moreover, the probate court found Amendment No. 2 to the Option Agreement was invalid. As set forth below, we conclude the probate court's decision is well founded.

### b. *Fairness Exception Does Not Apply*

The current statutory scheme governing no contest clauses applies retroactively. The latest amendments to the scheme became effective on January 1, 2010, but they "appl[y] to any instrument, wherever executed, that became irrevocable on or after January 1, 2001." (§ 21315, subd. (a).) Pursuant to section 3, subdivision (h), a party may qualify for a fairness exception to the presumptive retroactive applicability of the current law "if application of the former law would compel a different conclusion as to

---

[7] The Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.; ERISA).

enforceability of a no contest clause and it is established that the trustor(s) of the trust instrument drafted the no contest clause in reliance on the former law." (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 416.) However, "In most cases there will be no difference in result between the former law and the current law." (*Id.* at p. 433.)

In the instant action, there does not appear to be any dispute Borel relied on the former law in drafting the Trust's no contest clause. He executed the Trust shortly before the relevant amendments to the Probate Code were enacted by the Legislature. Thus, the pertinent question is whether the former law would produce a different result as to the enforceability of the no contest clause in this case. We conclude it would not.

Unlike the current statutory scheme, the former law allowed for the enforcement of a no contest clause against an "indirect contest." (Former §§ 21300, subd. (c), 21303.) An indirect contest was defined as "pleading in a proceeding in any court that indirectly challenges the validity of an instrument or one or more of its terms based on" any ground that does not constitute a direct contest.[8] (Former § 21300, subd. (c).) Although the definition of an indirect contest was quite broad, the former law also identified a number of proceedings that did not violate a no contest clause as a matter of public policy. (Former § 21305, subd. (b).) Those proceedings included a pleading challenging the exercise of a fiduciary power (former § 21305, subd. (b)(6)), a pleading regarding the interpretation of the instrument containing the no contest clause or an instrument expressly identified in the no contest clause (former § 21305, subd. (b)(9)), and a pleading regarding the reformation of an instrument to carry out the intention of the person creating the instrument (former § 21305, subd. (b)(11)).

In this case, the section 17200 petition stated the District intended to carry out Borel's intent of creating an agricultural park, but desired to modify some of the specific

---

[8] The grounds for bringing a direct contest under the former law were substantially similar to the grounds set forth in the current law. (Compare § 21310, subd. (b) and former § 21300, subd. (b).) They included: revocation, lack of capacity, fraud, misrepresentation, menace, duress, undue influence, mistake, lack of due execution, and forgery. (Former § 21300, subd. (b).)

conditions relating to the park due to the Trust's precarious financial situation. Accordingly, the section 17200 petition falls squarely under former section 21305, subdivision (b)(11), which exempts pleadings regarding reformation of instruments to carry out the intent of the settlor. Appellants contend this exception does not apply because the "sweeping" changes proposed in the petition actually thwarted Borel's intent. Appellants overstate the scope of the proposed modification. The section 17200 petition states that, even with the proposed modification, the District still intends to "establish an agricultural park and a related museum/public meeting space in a manner consistent with the Conceptual Plan . . . as may be feasible." The conceptual plan states that, consistent with the terms of the Trust, all permanent structures on the property will be retained, maintained, and restored; historic vehicles and farm equipment will be kept on display; and Borel's former residence will be refurbished and converted into a museum and meeting facility.

### 3. The District Has Standing

Next, appellants argue the probate court erred in finding the District had standing to contest Corrie's petition to enforce his option rights. We disagree. As the probate court held, a trust beneficiary has standing to sue third parties who, among other things, induce a trustee to commit a breach of trust. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 462 (*City of Atascadero*).) Such is the case here. The District challenged Corrie's petition on the grounds Flanagan breached her fiduciary duty as successor trustee by, among other things, entering into Amendment No. 2 with Corrie to obtain funds for her own personal use.

Relying on *City of Atascadero*, appellants now contend the District could only challenge Corrie's option rights by bringing some kind of affirmative tort claim. The argument is unavailing. In *City of Atascadero*, the court held that a beneficiary of a statutory trust investment had standing to sue a financial broker that had managed the trust's assets. (*City of Atascadero*, *supra*, 68 Cal.App.4th at pp. 451–458.) The court reasoned: "[I]t is well established that where a trustee has committed a breach of trust, the trust beneficiaries may prosecute an action against third persons who, for their own

22

financial gain or advantage, induced the trustee to commit the breach of trust; actively participated with, aided or abetted the trustee in that breach; or received and retained trust property from the trustee in knowing breach of trust." (*Id.* at p. 462.) While *City of Atascadero* involved a claim for breach of fiduciary duty, at no point did the court suggest a beneficiary's standing was contingent on whether it brought an affirmative tort claim.[9]

The District also had standing to challenge the Option Agreement because, pursuant to the section 1310(b) order, the trustee distributed the property to the District via unconditional grand deed. As the District owned the Danville property, it had standing to contest Corrie's claim to that property. Appellants argue the grant deed cannot serve as a basis for standing because their appeal of the section 1310(b) order was pending when the trial on the validity of the Option Agreement commenced. But as discussed at length above, actions taken by the trustee pursuant to the section 1310(b) order are valid, regardless of the outcome on appeal. Accordingly, the appeal of the section 1310(b) order had no effect on the District's interest in the Danville property.

### 4. Flanagan Was Not Authorized to Enter into Amendment No. 2

The probate court found the original Option Agreement and Amendment No. 1 to that agreement had expired, and therefore neither could provide a basis for Corrie's claim to enforce an option against the Danville property. The court also found Flanagan, as successor trustee, lacked the authority to enter into Amendment No. 2 to the Option Agreement. While the court conceded the Trust granted general powers to the successor trustee, it found those powers were subject to various limitations which precluded the trustee from entering into Amendment No. 2 with Corrie. The court reasoned

---

[9] Appellants also argue District lacked standing because they violated the Trust's no contest clause. In a related argument, they contend the pending appeals of the section 17200 and 1310 orders stayed the probate court's power to determine the District had not violated the Trust's no contest provisions. As discussed in section II.B.2., *ante*, the District's actions did not trigger the no contest clause. Moreover, appellants waived their jurisdictional argument when they stipulated the June trial should proceed notwithstanding their appeal of the section 17200 order.

23

Amendment No. 2 was inconsistent with Borel's general intent of creating an agricultural park on the Danville property and impaired the vested interests of the beneficiaries in the property.

Appellants argue the probate court expressed an "unduly restrictive" view of the successor trustee's powers, and section 6.8 of the Trust authorized Flanagan to agree to Amendment No. 2. Section 6.8 states the trustee may exercise various powers in order "[t]o carry out the purposes of the trust . . . , and subject to any limitations stated elsewhere in this instrument." Those powers included the authority to "convey, exchange, partition, and divide trust property," as well as the authority to "grant options for the sale or exchange of trust property for any purpose." According to appellants, execution of Amendment No. 2 was consistent with the purposes of the Trust, as it allowed the Trust to remain solvent. Appellants further argue Borel contemplated using the proceeds from the Option Agreement in this manner, as section 5.3 of the Trust states the successor trustee is to pay the estate's death taxes, debts, and expenses.

We are not persuaded. While section 6.8 of the Trust grants the trustee the general power to enter into option agreements, it also states that power may only be used to "carry out the purposes of the trust" and is "subject to any limitations stated elsewhere" in the Trust.[10] As the probate court found, extending Corrie's option to purchase a portion of the Danville property after Borel's death was inconsistent with the purpose of the Trust. Pursuant to sections 3.1 and 5.4 of the Trust, upon Borel's death, the beneficiaries' rights were to vest and the Trust was to become irrevocable and not subject to amendment. Upon Borel's death, the trustee was also to distribute the Danville property to the District. Extending Corrie's option to purchase a portion of the Danville

_____

[10] It is also questionable whether the Trust even grants a successor trustee the right to enter into option agreements. Section 6.8 of the Trust describes the general powers of the "trustee," not the successor trustee. Pursuant to section 6.3, references to the trustee "shall be deemed a reference to whoever is serving as trustee or cotrustees, and shall include alternate or successor trustees or cotrustees, *unless the context requires otherwise*." (Italics added.)

24

property after Borel's death simply was not compatible with the Trust's directive that the District take the property upon Borel's death.

Appellants also argue the probate court's interpretation of the Trust is inconsistent with our earlier opinion in *Corrie v. Soloway*, *supra*, 216 Cal.App.4th 436. The primary issue in that opinion was whether Amendment No. 2 cured the original Option Agreement's noncompliance with the Subdivision Map Act. (*Corrie v. Soloway*, at p. 443.) We concluded that it did. (*Ibid.*) In their appellate briefing, the District had also argued we did not need to consider the potential curative effect of Amendment No. 2 because the amendment was void as a matter of trust law. (*Id.* at p. 445.) The District contended an indemnity clause in Amendment No. 2—through which Corrie promised to indemnify the Trust—showed Corrie was aware Amendment No. 2 constituted a breach of trust that would deprive the District of its bequest. (*Id.* at pp. 445–446.) We disagreed, finding the indemnity clause was not an admission of fault or liability. (*Id.* at p. 446.) We added: "[T]he Borel Trust specifically confers broad powers on the successor trustee, including the power to grant options for the sale or exchange of trust property for any purpose, with or without prior court authorization. It is not clear why Corrie was required to ignore that express power." (*Ibid.*)

Appellants now seize on our statement that the Trust conferred broad power on the trustee. But this language is dicta, as we ultimately declined to rule on the District's argument that Flanagan was not authorized to enter into Amendment No. 2. Specifically, we stated: "Without prejudice to the District's position in any further proceedings on this point, there is no basis in the present record for this court to decide the breach of trust issue in favor of the District on this appeal." (*Corrie v. Soloway*, *supra*, 216 Cal.App.4th at p. 446.) Thus, our opinion in the prior appeal left the door open for the District to further develop its argument concerning Flanagan's authority to enter into the agreement. The District has done so, and we are now convinced Flanagan's actions were contrary to the terms of the Trust.

Even if appellants' interpretation of the Trust is correct, the probate court also found "Corrie and Flanagan negotiated Amendment #2 for their own personal purposes

25

and gain" and "in disregard of the interests of the beneficiaries." The court explained: "The negotiations pertaining to Amendment #2 were never disclosed to the beneficiaries, either before or after its execution. Similarly, the unenforceability of the Original Option or Amendment #1 was never made known to the beneficiaries. . . . To similar effect, neither the signing of Amendment #2 nor a copy of that agreement, was disclosed to the beneficiaries until Corrie sought to enforce his purported option rights at the end of 2011. [¶] . . . The Court finds that this failure to disclose their intent to enter into Amendment #2 or seek judicial approval of this agreement was intentional." (Fn. omitted.)

Appellants suggest there was no reason for Corrie to be concerned about Flanagan's failure to provide notice. They reason "Corrie was not the Trustee and didn't know, or care, whether the Trustee gave notice to any of the beneficiaries." Appellants also argue Flanagan's failure to provide notice was not significant because successor trustee Soloway also failed to provide notice when she later declared Corrie in default of the Option Agreement. The probate court addressed the first concern in its statement of decision, finding Corrie had filed petitions to instruct the trustee as to other matters, but not in connection with Amendment No. 2. Further, Flanagan's decision to sell off Trust property was of far greater consequence than Soloway's decision to notify Corrie of a default after he failed to make the required option payments. In any event, appellants do not appear to contest the court's factual finding that Flanagan entered into Amendment No. 2 for her own personal gain, and they have pointed to no evidence that would undermine the court's finding.

Accordingly, we conclude the probate court correctly found Flanagan lacked authority to enter into Amendment No. 2 and breached her fiduciary duty by doing so. Because the original Option Agreement and Amendment No. 1 had expired, Corrie had no right to any portion of the Danville property.

## III. DISPOSITION

The appeals from the section 17200 order (case No. A141625) and the section 1310(b) order (case No. A142154) are dismissed, as there is no relief we can

26

grant appellants in connection with those appeals.  As to the appeal from the judgment on the validity of the option (case No. A143688), we affirm.  Costs are awarded to the District.

                                                  _____

                                                  Margulies, J.

We concur:

_____

Humes, P.J.

_____

Dondero, J.

A141625, A142154, A143688

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. John Hideki Sugiyama

Counsel:

Gagen, McCoy, McMahon, Koss, Markowitz & Raines, Gregory L. McCoy and Lauren E. Dodge for Plaintiffs and Appellants.

Wendel, Rosen, Black & Dean LLP, David Goldman and Thiele R. Dunaway for Defendant and Respondent.